IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AMX CORPORATION, a Texas Corporation, | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:04-CV-2035-D |
| VS. | § § | |
| PILOTE FILMS, a French Company, | § § | |
| Defendant. | § § | |

MEMORANDUM OPINION
AND ORDER

Defendant's motion to dismiss for lack of personal jurisdiction requires the court to decide whether this court's jurisdiction is governed by a contractual forum selection clause and, if not, whether plaintiff has made a prima facie showing of specific jurisdiction.  Concluding that plaintiff has failed to demonstrate that the forum selection clause controls but that it has made a prima facie showing of specific jurisdiction, the court denies defendant's motion to dismiss.

I

This is a removed action in which plaintiff AMX Corporation ("AMX") sues defendant Pilote Films ("Pilote") seeking a declaratory judgment and to recover on claims for breach of contract, breach of fiduciary duty, and tortious interference with prospective relations.  AMX is a Texas corporation with its principal place of business in Texas.  It designs, develops, and markets integrated control systems that enable end-users to operate electronic devices from different manufacturers as an integrated network.  Pilote is a French *Société à Responsabilité Limitée*, a form of limited liability company.  It is organized and operated under French law, maintains its principal place of business in France, has never owned property or paid taxes in Texas, has never had an

employee based in Texas, and does not have a registered agent in Texas. Pilote moves to dismiss this action under Fed. R. Civ. P. 12(b)(2), contending that the court cannot exercise personal jurisdiction over it.

In 1994 AMX and Pilote entered into a distributorship agreement ("Agreement"), under which Pilote became the sole distributor of AMX's products in France.  The Agreement contains the following forum selection clause: "[a]ny action rising out of or under this Agreement may be filed and maintained in the federal or state courts of, or having jurisdiction over, Dallas County Texas, United States of America, and the parties consent to the jurisdiction of such courts." P. App. 10.  The Agreement required Pilote to place its orders with AMX in Texas.[1]  During a ten-year period, Pilote sent at least several hundred product purchase orders to AMX in Texas.  Pilote employees initiated communications with AMX in Texas on a weekly, if not almost daily, basis via telephone calls and emails, often engaging in multiple communications each day.  The products Pilote purchased from AMX were manufactured, assembled, and prepared for shipment in Texas. They were delivered to a common carrier in Texas for shipment to Pilote.  Under the Agreement, title passed to Pilote when AMX placed the products in the possession of the common carrier in Texas. Pilote made payments for the products by direct wire transfers to AMX's bank account in Texas.  Pilote's purchases from AMX over the ten-year relationship totaled more than $5 million. During the relationship, Pilote employees and officers have made several visits to AMX's plant in Texas, both for business and training purposes, and some have made multiple visits.  One Pilote officer attended at least one AMX trade show in Texas.

Although the parties' relationship has lasted over ten years, they disagree about whether the

---

[1]*See infra* note 7.

Agreement has controlled their relationship the entire time.  The Agreement states: "This Agreement shall be for an initial term of one (1) year from the date hereof unless sooner terminated in accordance with the provisions of Section 13 below.  By mutual written agreement, AMX and Distributor may extend this Agreement for additional one (1) year terms."  P. App. 8.

Pilote argues that the Agreement expired by its own terms in 1995 and that the parties' current relationship arose under, and is governed by, French law, and has no relationship with Texas. AMX asserts that the parties' current relationship stems directly from the Agreement, and that they have continued to operate under the same terms and conditions for over ten years.  It contends that the parties have extended the Agreement for additional one-year terms by signing and filling purchase orders and making shipments and payments under its terms.  AMX maintains that the most recent term of the Agreement ended on February 1, 2005.  The Agreement provides that it "shall be deemed to have been executed and delivered and is to be performed in part in the State of Texas[.]" P. App. 10.  It also includes this choice-of-law provision: "[t]he substantive laws of the State of Texas, excluding any conflicts of law or principle that might otherwise refer to the substantive law of another jurisdiction, shall govern the interpretation, validity and effect of this Agreement."  *Id*. The Agreement also provides that Pilote constituted and appointed the Secretary of State of the State of Texas as its agent for service of process in any action arising out of or under the Agreement.

II

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citing, *inter alia*, *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)).  The determination whether a federal district

court has personal jurisdiction over a nonresident defendant is bipartite.  The court first decides whether the long-arm statute of the state in which it sits confers personal jurisdiction over the defendant.  If it does, the court then resolves whether the exercise of jurisdiction "is consistent with due process under the United States Constitution."  *See Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999).  Because the Texas long-arm statute extends to the limits of due process, the court need only consider whether exercising jurisdiction over defendants would be consistent with the Due Process Clause of the Fourteenth Amendment.  *See id.*; *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).

> The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice."  To comport with due process, the defendant's conduct in connection with the forum state must be such that he "should reasonably anticipate being haled into court" in the forum state.

*Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (footnotes omitted).  To determine whether exercising jurisdiction would satisfy traditional notions of fair play and substantial justice, the court examines "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies."  *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 421 (5th Cir. 1993).

A defendant's contacts with the forum may support either specific or general jurisdiction.  *See Mink*, 190 F.3d at 336.  "Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action.  General jurisdiction

exists when a defendant's contacts with the forum state are unrelated to the cause of action but are continuous and systematic." *Id.* (citations and internal quotation marks omitted).

When, as here, the court decides a motion to dismiss without holding an evidentiary hearing, the plaintiff need only present sufficient facts to make out a prima facie case supporting personal jurisdiction. *See, e.g., Alpine View*, 205 F.3d at 215. To decide whether a prima facie case exists, the court must accept as true AMX's "uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000) (internal quotation marks omitted) (quoting *Alpine View*, 205 F.3d at 214); *see Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211-13 (5th Cir. 1999) (resolving in plaintiff's favor conflict regarding truth of plaintiff's jurisdictional proof where district court did not hold evidentiary hearing). "This liberal standard, however, does not require the court to credit conclusory allegations, even if they remain uncontradicted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, No. 3:00-CV-1165-D, slip op. at 5 (N.D. Tex. Sept. 15, 2000) (Fitzwater, J.) (citing *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 n.16 (5th Cir. 1996)), *aff'd*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam) (affirming, *inter alia*, this conclusion).

III

The court will first determine whether it may exercise jurisdiction over Pilote based on the Agreement's forum selection clause.

A

AMX argues that Pilote voluntarily consented under the terms of the forum selection clause to this court's jurisdiction. It maintains that it has provided both testimonial and documentary proof

that the Agreement did not expire in 1995, and that the evidence is sufficient to demonstrate the continuing enforceability of the clause.  AMX also maintains that any conflicts regarding the facts must be resolved in its favor.  It reasons that, for purposes of this motion, the court must accept as true the fact that the Agreement was in effect at the time AMX brought suit and, consequently, that Pilote consented to jurisdiction in this forum under the forum selection clause.

As evidence that the Agreement was extended, AMX relies on the affidavit of Michael Olinger ("Olinger"), AMX's Vice President of International Sales.  Olinger avers that the parties' current relationship stems directly from the Agreement, and that they have continued to operate under the contract's terms and conditions for more than ten years, as evidenced by purchase orders and repair orders that AMX has provided.  He also states that Pilote never communicated to him before AMX brought suit that it considered the Agreement terminated.  The purchase and repair orders AMX has introduced include dates from 1999 to 2004.  Olinger also avers that AMX sent voluminous invoices to Pilote before 1999, and that all these invoices were generated as a result of purchase orders that Pilote placed with AMX in Texas.  For purposes of deciding this motion, the court accepts this evidence as true.  *See Kelly*, 213 F.3d at 854.

In arguing that its evidence is sufficient to demonstrate the continuing enforceability of the forum selection clause, AMX relies on the Texas Court of Appeals decision in *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340 (Tex. App. 2001, pet. denied).  In *Sieber* the trial court, following a bench trial, held that an indemnity provision in a written contract that had expired by its own terms was enforceable where the parties continued their relationship after the contract expired.  *Id. at* 344, 346.  The trial court found that the written contract had "continued in full force and effect" and that the parties "continued to act and perform under the contract[.]"  *Id.* at 345.  The

court of appeals upheld the trial court's finding as supported by sufficient evidence. *Id*. at 347.

Pilote's understanding of its relationship with AMX is different.  In each of its briefs, Pilote places particular emphasis on the Agreement's clause that states that "[b]y mutual written agreement, AMX and Distributor may extend this Agreement for additional one (1) year terms." P. App. 8.  In its initial brief, Pilote cites this language and posits that the parties never signed a written agreement to extend the Agreement.  In apparent reliance on this assertion, it argues that the Agreement expired by its own terms in 1995.  Pilote enlarges on this argument in its reply brief, contending that, because the Agreement expired in 1995, the forum selection clause is ineffective. It asserts that the Agreement requires that any extension be in writing, and that it does not contain a so-called "evergreen provision," under which the contract renews automatically.  Pilote contends that AMX has not offered any evidence or argument that the Agreement did not require the extension to be in writing, and it posits that AMX has neither argued nor adduced evidence to show that a written extension ever occurred.  Pilote reasons that these omissions are fatal to AMX's consent-to-jurisdiction argument.

Pilote also attempts to distinguish *Sieber* based on language in the Agreement.  It argues, *inter alia*, that the parties expressly agreed on the method by which the Agreement could be extended, and that in *Sieber* there is no discussion of similar language.  It therefore maintains that *Sieber* does not support disregarding express contractual language that requires that extensions be agreed to in writing by both parties.  Pilote argues that, under Texas law, an unambiguous contract must be read as a matter of law without resort to parole evidence.  It posits that the court must look only to the Agreement to ascertain the parties' intentions, and that the parties expressly agreed that the Agreement would expire unless extended in writing by both parties.

B

The court must first determine whether AMX has presented prima facie evidence that the Agreement did not expire in 1995 and has governed the entirety of the parties' relationship. If AMX has met this burden, the court need not consider any of Pilote's other arguments regarding the Agreement's forum selection clause, because they depend entirely on the premise that the Agreement expired.

The court rejects, as a threshold matter, Pilote's reliance on the parol evidence rule. "The parol evidence rule excludes only prior and contemporaneous negotiations. It does not apply to subsequent agreements entered into by the parties." *Garcia v. Karam*, 276 S.W.2d 255, 258 (Tex. 1955); *see also Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex. 1979) ("The parol evidence rule does not apply to agreements made subsequent to the written agreement."). The actions that AMX and Pilote took that allegedly manifest their willingness to extend the Agreement—e.g., signing and filling purchase orders—all occurred after the Agreement's inception, and they appear to support a "subsequent agreement" by the parties to extend the Agreement. Consequently, the parol evidence rule does not prohibit consideration of the evidence that AMX offers to establish that the Agreement was extended.

Although the parol evidence rule does not assist Pilote, AMX has failed to show that the Agreement (and the forum selection clause) controls.[2] Pilote relies on the Agreement's terms in contending that it expired in 1995. Under Texas law, "[i]n construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument."

---

[2]Because the viability of the Agreement is an issue that affects resolution of the merits of part of AMX's lawsuit, the court notes that this decision applies to Pilote's motion to dismiss and does not foreclose AMX from otherwise attempting to meet its burden of proof at other stages of the case.

*Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In doing so, the court must "attempt to give

effect to all contract provisions so that none will be rendered meaningless." *Kelley-Coppedge, Inc.*

*v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *see also Harmon v. 1401 Elm St. Condo.*

*Ass'n - Insignia/Esc of Tex., Inc.*, 139 S.W.3d 411, 414 (Tex. App. 2004, no pet.) ("In construing

an unambiguous contract, a court should attempt to harmonize and give effect to all provisions so

that none is rendered meaningless." (citing *Coker*, 650 S.W.2d at 393)). The language of the

Agreement unequivocally provides that its term was one year, unless terminated sooner. This means

that the Agreement was set to expire on February 1, 1995, because the parties entered into it on

February 1, 1994. The Agreement does explicitly provide for its extension and appears to indicate

the manner in which the parties may affect such an extension: "by mutual written agreement." P.

App. 8. Although in each of Pilote's briefs this language serves as the basis for its argument that

the Agreement expired in 1995, and AMX has now twice had the opportunity to respond to Pilote's

arguments, AMX has not adequately explained why this language should not be given effect.

Although AMX avers that the parties expressed their willingness to extend the Agreement

by signing and filling purchase orders and by making shipments and payments under its terms,

viewing the evidence and AMX's arguments in their entirety, the court does not construe this as an

assertion that the parties actually agreed in writing to extend the Agreement. Olinger avers that

"[t]he Parties' current relationship stems directly from the . . . Agreement, and the Parties have

continued to operate under the terms and conditions of the Agreement for more than ten years as is

evidenced by the purchase orders and repair orders attached [to his affidavit]." P. App. 4. In

response to Pilote's argument that the Agreement expired in 1995, AMX argues that it has presented

"proof that the opposite was true, *i.e.*, the parties had continued to conduct their business

relationship under the terms and conditions of the . . . Agreement for nearly ten years." P. Surreply at 2. In a footnote that follows this assertion, AMX posits: "[f]or example, AMX presented numerous purchase orders placed by Pilote with AMX in Texas under the terms of the . . . Agreement. These purchase orders and the parties continuing course of conduct are sufficient to establish the parties' intent to renew the . . . Agreement on a yearly basis through February 2005." *Id.* at 2 n.2. AMX appears to contend that the parties extended the Agreement simply by manifesting their intent to do so by continuing to perform under its terms. AMX's arguments do not adequately explain , however, why the parties were free to manifest their intent in this manner rather than as established in the Agreement.

AMX's reliance on *Sieber* also fails to show why effect should not be given to the Agreement's language. While *Sieber* may support the argument that a contract that expires by its own terms may continue to govern the parties' relationship when they continue to perform under its terms after the contract expires, it does not explain why effect should not given to the language of the Agreement here. As Pilote correctly notes, there is no discussion of similar language in *Sieber*. AMX does not advance an argument why *Sieber* vitiates the effect of the provision of the Agreement at issue here. Thus AMX's reliance on *Sieber* is insufficient to confute Pilote's argument that the Agreement expired because the parties did not mutually agree in writing to extend it.

If the court were to conclude that AMX and Pilote could extend the Agreement beyond its initial term without manifesting in writing their agreement to do so, it would render a nullity the Agreement's clause that specifies the way by which the parties may extend it. Because the court in interpreting a contract is obligated to give effect to all its provisions, it is hesitant to reach this conclusion absent a sufficient legal basis. Because the Agreement provides that extensions occur

through mutual written assent, and AMX has shown neither that such an agreement exists nor advanced a reason why it is unnecessary,[3] AMX has failed to make a prima facie showing that the Agreement continued to control the parties' relationship after 1995.  Accordingly, the court must now address Pilote's argument that the forum selection clause is ineffective because the Agreement expired.

C

Pilote's effort to avoid the effect of the forum selection clause by contending the Agreement expired is not novel.  Other courts have considered similar attempts to avoid the effect of particular contractual provisions.  *See, e.g., Nissan N. Am., Inc. v. Jim M'Lady Oldsmobile, Inc.*, 307 F.3d 601, 603-04 (7th Cir. 2002) (considering respondent's argument that district court erred in compelling arbitration concerning dispute that arose after contract containing arbitration clause expired); *Young Women's Christian Ass'n v. HMC Entm't, Inc.*, 1992 WL 279361, at *1, *4 (S.D.N.Y. Sept. 25, 1992) (considering plaintiff's argument that forum selection clause was irrelevant to the suit because the contract containing the clause expired); *Tex. Source Group, Inc. v. CCH, Inc.*, 967 F. Supp. 234, 236, 238 (S.D. Tex. 1997) (considering plaintiffs' argument that forum selection clause was unenforceable because, *inter alia*, agreement containing clause had expired).  These efforts have not always succeeded.  The courts in *Young Women's Christian Ass'n* and *Texas Source Group* enforced forum selection clauses despite the expiration of the contracts that contained them.  *See Young Women's Christian Ass'n*, 1992 WL 279361 at *1, *4; *Tex. Source Group*, 967 F. Supp. at 236, 238-39.  These decisions suggest that, even if, as Pilote argues, the Agreement expired in 1995, the

---

[3]For example, AMX has not argued that the parties waived or otherwise modified the relevant provision of the Agreement.

forum selection clause is not necessarily rendered ineffective. Nevertheless, *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991), makes clear that the expiration of a contract can affect the continuing applicability of a contractual provision.

In *Litton* the parties had entered into a collective bargaining agreement that remained in effect until October 1979 and that contained an arbitration clause. *Id*. at 193-94. The union filed grievances asserting violations of the agreement after Litton laid off a number of workers in August and September 1980. *Id*. at 194. The Supreme Court addressed the question whether the grievances were arbitrable. *Id*. at 197-98. It discussed *Nolde Brothers, Inc. v. Bakery Workers*, 430 U.S. 243 (1977), which "found a presumption in favor of postexpiration arbitration of matters unless 'negated expressly or by clear implication[.]'" *Litton*, 501 U.S. at 203-04 (quoting *Nolde Bros.*, 430 U.S. at 255). The Court held that this "presumption is limited to disputes arising under the contract." *Id*. at 205. The Court explained that

> [a] postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Id*. at 205-06. The Court reasoned that "[a]ny other reading of *Nolde Brothers* seems to assume that postexpiration terms and conditions of employment which coincide with the contractual terms can be said to arise under an expired contract, merely because the contract would have applied to those matters had it not expired." *Id*. at 206. The Court noted, however, that such an "interpretation fails to recognize that an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Id*. Applying these principles, the Court recognized that the layoffs in question "took

place almost one year after the [parties'] [a]greement had expired." *Id.* at 209.  It held that the grievances regarding the layoffs "are arbitrable only if they involve rights which accrued or vested under the [a]greement, or rights which carried over after expiration of the [a]greement[.]" *Id.* Concluding that the relevant layoff provision could not "be said to create a right that vested or accrued during the terms of the Agreement or a contractual obligation that carries over after expiration," the Court reversed the court of appeals, which had held that the National Labor Relations Board erred in holding the layoff grievances were not arbitrable. *Id.* at 197, 209-11.

*Litton* guides this court's determination whether the forum selection clause controls the dispute between AMX and Pilote.  Although *Litton* arose in the context of a labor dispute and involved an arbitration clause instead of a forum selection clause, its principles can still apply to the present case.  *See Tristar Fin. Ins. Agency, Inc. v. Sec. Ins. Co. of Hartford*, 97 Fed. Appx. 462, 466 (5th Cir. 2004) (unpublished opinion) ("[W]hile *Litton* involved a labor arbitration dispute, the decision is not based on peculiarities of labor law[.]"); *see also Basketball Mktg. Co. v. Urbanworks Entm't*, 2004 WL 2590506, at *1, *5-*6 (E.D. Pa. Nov. 10, 2004) (explicitly holding that *Litton*'s logic applies to general contracts and applying it to determine whether arbitration clause governed dispute outside labor context).  Moreover,

> [b]oth the United States Supreme Court and the Fifth Circuit have noted the similarities between arbitration clauses and forum selection clauses and have applied the same enforceability analysis to both because an arbitration clause is, "in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."

*Smith v. Lucent Techs., Inc.*, 2004 WL 515769, at *8 n.33 (E.D. La. Mar. 16, 2004) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974), and citing *Haynsworth v. Corp.*, 121 F.3d 956, 963 (5th Cir. 1997)).  Thus the court will apply *Litton*'s principles in determining whether the

- 13 -

Agreement's forum selection clause controls this case.

AMX asserts claims for declaratory judgment, breach of contract, breach of fiduciary duty, and tortious interference with prospective relations. AMX alleges that, in an effort to promote sales of its products in France, it invited Pilote in June 2004 to join it in organizing a road show planned for September 2004 to promote new AMX products to dealers and prospective dealers. Pilote failed to respond to this invitation and three additional requests that AMX made in July 2004. Because Pilote never responded, AMX sent invitations to French dealers and prospective dealers without being in a position to present Pilote's role in the events.

AMX seeks a declaration that, by its actions, Pilote has breached the 1994 Agreement. In pleading this declaratory judgment claim, AMX does not explicitly direct the court to the actions Pilote took to breach the Agreement. In a section of its petition that immediately precedes its claim, however, AMX avers on information and belief that Pilote has ceased using its best efforts to market, sell, and distribute AMX products in its territory by failing to (1) update its website with new AMX products in more than twelve months, (2) cooperate with AMX to promote its products in organizing the September road show, and (3) actively promote and/or sell AMX products. AMX does not allege, and it has not made a prima face showing, that any of the above acts or omissions occurred before February 1, 1995, when the initial term of the Agreement expired.[4] At least one or all of these allegations also serve as the basis for AMX's other claims. Accordingly, AMX has failed to make a prima facie showing that its claims are based on facts that predate expiration of the Agreement.

------------------------------------------------

[4] The court is unable to conclude definitively that *all* the actions AMX alleges as the basis for its claims occurred after February 1, 1995.

- 14 -

Although AMX cites in its petition parts of the Agreement that require Pilote to devote its best efforts to promote, market, sell, and distribute AMX's products throughout its territory and to cooperate with AMX in doing so,[5] these provisions do not suggest that these obligations continued beyond the Agreement's expiration date.  Additionally, AMX does not argue, and it is not apparent from its petition, that its claims are based on rights that vested during the life of the Agreement.  Consequently, AMX has failed to make a prima facie showing that its claims meet any of the conditions in *Litton* that would support applying the forum selection clause after the Agreement expired.  Because the forum selection clause does not contain language that suggests that it extends beyond the Agreement's expiration, and AMX has failed to show the existence of any of the *Litton* conditions, AMX cannot predicate personal jurisdiction over Pilote on this clause.  *See Basketball Mktg.*, 2004 WL 2590506, at *6 ("Once the underlying contract expires, an arbitration clause survives to cover only those exceptions outlined in *Litton*, unless the parties include language within the clause extending its duration.").

---

[5]AMX quotes § 2(c) of the Agreement, which states:

> Distributor agrees to devote its best efforts and abilities to (i) promote and sell the Products throughout the Territory and cooperate with AMX in doing so, (ii) provide and maintain competent and aggressive solicitation for the state of Products in the Territory, (iii) ensure competent technical assistance, prompt handling of requests for quotations, orders and similar inquiries, (iv) maintain careful attention to customers' service requirements for the Products, and (v) handle all programming and other customer support necessary or desirable for the promotion, installation and service of Products in the Territory.

P. App. 5-6.  It also quotes Section 9 of the Agreement, which reads: "Distributor hereby covenants and agrees with AMX that it: (a) will use its best efforts to market, sell and distribute the Products in the Territory[.]" P. App. 7.

IV

The court now considers whether AMX has made a prima facie showing that the court has specific jurisdiction because AMX's claims arise out of or relate to Pilote's contacts with Texas.

A

AMX appears to base at least part of its jurisdictional argument on the Agreement. For example, it points to the forum selection clause and to language in the Agreement that indicates that it is "to have been executed and delivered and is to be performed in part in the State of Texas[.]"[6] P. App. 10. It avers that the Agreement required Pilote to order products from AMX in Texas and submit payments to AMX's bank account in Texas.[7] And it also maintains that the products Pilote presumably purchased were manufactured, assembled, and prepared for shipment in Texas, and that,

_____

[6]AMX also alleges that the parties agreed that the Agreement was negotiated in Texas. This assertion is neither directly supported by the language of the Agreement nor by other evidence that AMX has adduced or by uncontroverted allegations in AMX's petition. Accordingly, the court will disregard this allegation for purposes of this motion. *See Latshaw*, 167 F.3d at 211 ("When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed by the affidavits.").

[7]The language of the Agreement does not directly support this assertion. The provision that AMX cites in support of this averment provides, in pertinent part, that "[p]urchases under this Agreement shall be made by purchase orders submitted on a form approved by AMX. All purchase orders submitted hereunder are subject to written acceptance by AMX." P. App. 6. This clause does not specifically indicate that Pilote was obligated to order products from AMX in Texas. Olinger avers, however, that "[u]nder the 1994 Agreement, Pilote was required to place its orders for products with AMX in Texas." P. App. 2. Pilote does not appear to challenge this assertion. For purposes of this motion, the court will accept Olinger's assertion as true.

Additionally, in support of its assertion that the Agreement required Pilote to submit payments to AMX's bank account in Texas, AMX cites Olinger's affidavit, which states: "Pilote made payments for the products that it ordered from AMX by making direct wire transfers to AMX's bank account, which has at all times been located in Texas." *Id.* at 4. Although Olinger indicates that Pilote has made payments to AMX's bank account, his testimony does not directly support the proposition that the Agreement required that it do so.

- 16 -

under the Agreement, title to the products passed in Texas.  AMX contends the parties have been proceeding under the same terms and conditions every year since 1995.

Pilote contests the court's jurisdiction.  It appears to argue that specific jurisdiction cannot be based on the Agreement because it expired by its own terms in 1995.  Pilote argues that the parties' current relationship arose under French law, is governed by French law, and has no relationship with Texas.  Pilote also appears to contend that the contacts that do arguably have a connection to Texas are unrelated to AMX's causes of action or that AMX has failed to show that they are related.  For example, Pilote denies that specific jurisdiction can be based on purchase orders, the alleged manufacture of products in Texas, and the alleged wire transfer of payments to a Texas bank.  It argues that jurisdiction based on these contacts would only be proper in a dispute over Pilote's specific purchases of, as well as payments for, AMX products.  Moreover, it contends that the random telephone calls and emails between the parties are insufficient to establish specific jurisdiction.  It posits that there is no evidence of the content of the alleged telephone and email communications, and that, absent such proof, it cannot be determined whether AMX's claims relate to any of these alleged communications.  Pilote also maintains that business, training, and trade show trips are insufficient to bring it within the specific personal jurisdiction of a Texas court for a dispute regarding its performance of a French agreement in France.

B

Pilote's arguments challenging the court's exercise of specific jurisdiction appear to center on the relationship (or lack thereof) between AMX's causes of action and Pilote's contacts with Texas.  "When specific jurisdiction is asserted, the cause of action must arise out of or relate to the nonresident defendant's contacts with Texas." *Jones v. Petty-Ray Geophysical, Geosource, Inc.*,

954 F.2d 1061, 1068 (5th Cir. 1992).

1

The court will first determine whether AMX's breach of contract cause of action arises out of or relates to Pilote's contacts with Texas.  AMX's contract claim depends explicitly on the premise that the Agreement was in effect at the time Pilote made the omissions of which AMX complains.  It either seeks a court declaration, or specifically avers, that Pilote breached the Agreement.  AMX has failed to show that the Agreement continued beyond 1995.  It has also failed to demonstrate that its claims arise under the Agreement in that they are based on facts that predate the Agreement's expiration or involve rights that vested during the life of the Agreement or continue beyond its expiration.  AMX has therefore failed to show any real relationship between the Agreement and its claims.  Accordingly, even if the terms of the Agreement are sufficient to show that Pilote purposefully directed its activities to Texas, they cannot serve as contacts to support jurisdiction for claims based on injuries AMX sustained as a result of actions or omissions committed by Pilote many years after the Agreement expired.[8]  Moreover, even if, as AMX contends, the parties did continue to perform according to the terms and conditions of the Agreement after 1995, these contacts would not be related to a breach of the Agreement, but rather to the breach of a subsequent contract between the parties arising after the expiration of the Agreement that incorporates the Agreement's relevant terms.[9]  AMX has not asserted claims here based on any

---

[8]As noted, *see supra* note 2, the conclusion that the Agreement expired is being made in the context of Pilote's motion to dismiss, and does not necessarily apply to the merits of this lawsuit.

[9]The court recognizes that at least one Texas court has observed that implied agreements can arise as a result of continued performance by the parties after a contract has expired.  *See Emmer v. Phillips Petroleum Co.*, 668 S.W.2d 487, 490-91 (Tex. App. 1984, no writ) (holding that where the parties' written contract had expired, "[i]f the parties have rights and obligations toward each

subsequent agreement.

2

The same analysis does not apply to AMX's tort claims.[10] Unlike its contract claims, neither

of its tort claims specifically invokes or depends on the Agreement. Concerning breach of fiduciary

duty, AMX avers that "AMX and Pilote had a fiduciary relationship in that AMX gave Pilote an

exclusive distributorship for the Territory for ten years so that AMX relied on Pilote to act in

AMX's best interest." P. Pet. at 7-8. Pilote's alleged fiduciary obligations thus appear to be tied,

not to the Agreement, but to the fact that Pilote was AMX's exclusive distributor or that AMX

granted it an exclusive distributorship for ten years.

AMX has made a prima facie showing that the parties engaged in a continuous, ongoing

relationship—albeit not under the Agreement itself—for more than ten years. Olinger avers that

"the Parties have continued to operate under the terms and conditions of the . . . Agreement for more

than ten years[.]" P. App. 4. AMX has proffered purchase and repair orders that Pilote placed with

AMX in Texas that span the period 1999 to 2004. Olinger maintains that AMX's accounting records

---

other, those matters exist under an implied contract created by their acts and conduct after the express contract expired."). Here, however, AMX does not rely on an implied contract to recover against Pilote; it sues on the 1994 Agreement.

[10]Pilote argues that AMX is not alleging a tort at all, but is asserting that Pilote breached its contractual duties. It posits that AMX is not complaining of any obligation that is separate and independent from the alleged contractual obligations between the parties. Pilote appears to have raised this argument in response to AMX's alternative contention that jurisdiction is appropriate under *Calder v. Jones*, 465 U.S. 783 (1984), because Pilote engaged in intentionally tortious activity knowing that AMX would feel the brunt of the injury in Texas. Because courts have applied the *Calder* "effects" test in determining whether a court may exercise specific jurisdiction based on a tort claim, Pilote's argument appears to be directed to showing that an analysis under *Calder* in this case is inappropriate because AMX's tort claims are not really tort claims at all, but contract claims. Because the court does not rely on *Calder* and its progeny in reaching its conclusion, the court need not consider Pilote's argument.

reveal that AMX sent voluminous invoices to Pilote before 1999. Although Pilote vigorously disputes that the Agreement controlled the parties' relationship past 1995, it does not challenge the existence and/or duration of the AMX-Pilote relationship. Bettina Hulsmeyer, a Pilote representative, acknowledges in her affidavit that Pilote acts as AMX's exclusive distributor in France under the parties' continuing relationship. Moreover, the parties appear to agree that their relationship is contractual in nature, although they disagree on the form the contract takes. AMX maintains that the parties' relationship has been governed the entire time by the Agreement, whereas Pilote contends that the Agreement expired in 1995 and that the parties' continuing relationship arises under, and is governed by, French law and requires the nexus of the agreement to be in France.

Many courts, including several within this circuit, have considered the existence of an ongoing business relationship between the defendant and a resident of the forum state when determining that the defendant had sufficient contacts with the forum state to support the exercise of personal jurisdiction. *See, e.g.*, *Latshaw*, 167 F.3d at 213 (holding that defendant "purposefully availed himself of the benefits and protections of doing business in Texas and could reasonably anticipate being haled into court there" where he "entered into an ongoing business relationship with a Texas resident (and his company) and made multiple trips and phone calls to Texas in furtherance of that relationship."); *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1206 (5th Cir. 1993) (concluding that jurisdiction was properly exercised where "[t]he parties had an ongoing business relationship, and the Appellants' contacts with the forum state were not fortuitous."); *Trinity Indus., Inc. v. Myers & Assocs., Ltd.*, 41 F.3d 229, 231 (5th Cir.1995) (finding requisite purposeful availment where defendants "deliberately availed themselves of the benefits of an [eight

year,] ongoing relationship with a Texas client[.]"); *S. Bleacher Co. v. Husco, Inc.*, 2001 WL 497772, at \*4 (N.D. Tex. May 7, 2001) (Buchmeyer, C.J.) (finding that defendant had established sufficient minimum contacts with Texas where he "knowingly maintained an ongoing business relationship" with plaintiff); *S. Sys., Inc. v. Torrid Oven Ltd.*, 58 F.Supp.2d 843, 850 (W.D. Tenn. 1999) (holding that "[t]he continuous business relations between Plaintiff and Defendant from 1994 through 1998 demonstrate that Defendant has deliberately availed itself of the privilege of doing business in Tennessee."); *Harley-Davidson Motor Co. v. Motor Sport, Inc.*, 960 F. Supp. 1386, 1392-93 (E.D. Wis. 1997); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) ("[W]ith respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)); *Nocando Mem Holdings, Ltd. v. Credit Commercial de France, S.A.*, 2004 WL 2603739, at \*25-\*28 (W.D. Tex. Oct. 6, 2004) (recognizing that "courts have found the existence of specific personal jurisdiction when defendants deliberately availed themselves of the benefits of an ongoing relationship with a Texas client" and discussing relevant cases).

The relationship between the parties in *Harley-Davidson* is very similar to the one between AMX and Pilote. The defendant, a Puerto Rican corporation, entered into a longstanding distribution relationship with the plaintiff to distribute plaintiff's products in Puerto Rico. *See Harley-Davidson*, 960 F. Supp. at 1387-88. The relationship began in or about 1975, and when the last written agreement expired in 1981, the parties continued to do business until at least 1997. *See id*. In determining whether the non-resident defendant had established sufficient minimum contacts

with the forum state to justify the exercise of personal jurisdiction, the court took particular note of the facts in *Burger King*. *Id*. at 1392. The court recognized that in *Burger King* the "defendant 'deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization.'" *Id*. (quoting *Burger King*, 471 U.S. at 479-80 (internal quotation marks omitted)). Concerning the facts of the case before it, the court found that "[t]he relationship between [the parties was] similarly longlasting and continuous." *Id*. It observed that the defendant had chosen to sell the plaintiff's products since 1975 and that "[t]o do so, it had to order all parts and accessories through the plaintiff's Milwaukee headquarters . . . communicate with the plaintiff's employees in Milwaukee for several different reasons, and . . . send its payments to Milwaukee." *Id*. The court also noted that the defendant had "purposefully reached out, negotiated, and reached an agreement with [plaintiff]." *Id*. The court concluded that defendant's contacts with the forum state were neither "random, fortuitous, nor attenuated[,]" and it held that the exercise of jurisdiction was proper. *Id*. at 1392-93.

The *Trinity Industries* court also found sufficient minimum contacts on analogous facts. It considered whether specific jurisdiction was proper over an Illinois attorney and his law firm for claims brought in Texas by one of their Texas-based clients. *Trinity Indus.*, 41 F.3d at 230-31. The court noted that the lawyer considered the Texas plaintiff a major client and that his firm had represented the client over a period of eight years. *Id*. at 231. It also observed that "[t]he legal representation required regular mail and telephonic communications with Texas and, on occasion, physical presence for meetings in Dallas." *Id*. The attorney also represented the plaintiff over three years in litigation in Texas, and the firm billed the plaintiff in Texas and payment was made from

there.  *Id.*  Mirroring the court's conclusion in *Harley-Davidson*, the court held that

> [t]hese contacts amount to a substantial connection with Texas and cannot accurately be characterized as random, fortuitous, or incidental.  Rather, they indicate that the defendants deliberately availed themselves of the benefits of an ongoing relationship with a Texas client and reasonably should have anticipated the possibility of being haled into court in Texas for claims arising out of or related to that relationship.

*Id.*

Like the defendants in *Harley-Davidson* and *Trinity Industries*, Pilote has established sufficient minimum contacts with Texas to subject it to specific jurisdiction.  AMX has produced sufficient evidence that Pilote has engaged in a distributorship relationship for more than ten years with AMX.   During this relationship, Pilote employees initiated telephone and email communications with AMX employees in Texas on a weekly, if not almost daily, basis.  Pilote officers and employees have made several visits to AMX's facility in Texas for business and training purposes.  *See Latshaw*, 167 F.3d at 213 (finding that defendant had "purposefully availed himself of the benefits and protections of doing business in Texas and could reasonably anticipate being haled into court there" where he "entered into an ongoing business relationship with a Texas resident (and his company) and made multiple trips and phone calls to Texas in furtherance of that relatioship.").  AMX also avers, and Pilote does not deny,[11] that the Agreement required Pilote to place its orders for products with AMX in Texas.  *See Harley-Davidson*, 960 F. Supp at 1392.  Although AMX has not introduced sufficient evidence to show that the Agreement extended beyond 1995, Olinger has averred that the parties continued to operate under the Agreement's terms and conditions for more than ten years.  In deciding this motion, the court will assume that the

---

[11]*See supra* note 7.

requirement to place orders in Texas continued throughout the parties' relationship. Olinger's affidavit suggests that Pilote placed orders with AMX in Texas over the course of their relationship. *See* P. App. 3 ("Over the course of the Parties' ten-year relationship, Pilote sent several hundred purchase[ ] orders to AMX in Texas."). If AMX products required repair or replacement, Pilote would often return them to AMX in Texas. *Id.* AMX's evidence also suggests that Pilote paid for products by direct wire transfers to AMX's bank account in Texas. These contacts show that Pilote "deliberately availed [itself] of the benefits of an ongoing relationship with [AMX] and reasonably should have anticipated the possibility of being haled into court in Texas for claims arising out of or related to that relationship." *Trinity Indus.*, 41 F.3d at 231. The court also considers it significant that the parties' relationship started on the basis of an agreement wherein Pilote specifically agreed to the application of Texas law to questions concerning the interpretation, validity, and effect of the Agreement and consented to the jurisdiction of Texas courts for actions arising out of or under the Agreement. Although AMX has not shown that the Agreement extended past 1995, these contacts are still relevant where, as here, the parties do not appear to have renegotiated the terms of their relationship and AMX specifically avers that the parties have continued to perform according to the terms of the Agreement the entire time.

The next question is whether AMX's breach of fiduciary duty claim arises out of or relates to Pilote's contacts with Texas. The Third Circuit recently recognized that "the question of what level of relationship is necessary under the 'arise out of or relate to' requirement . . . has plagued federal Courts of Appeals and has resulted in divergent rules." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 99-100 (3d Cir. 2004). Courts, including some in this circuit, have explained the concept of relatedness for personal jurisdiction purposes differently. Some cases suggest that the

requirement is satisfied when a "but for" relationship exists between the defendant's forum contacts and plaintiff's cause of action. *See Trinity Indus.*, 41 F.3d at 231-32; *Nocando*, WL 2603739, at *20 n.12 (citing *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260 (5th Cir. Unit A Aug. 1981), in observing that there is some support in this circuit for assertion "that a but-for relationship is sufficient to satisfy the relatedness requirement."). In *Prejean* the Fifth Circuit considered the argument of a defendant who attempted to avoid jurisdiction on the basis that "a tort suit cannot arise from a contractual contact[.]" *Prejean*, 652 F.2d at 1270 n.21. The panel rejected this contention, concluding that "there is no reason why a tort cannot grow out of a contractual contact. In a case like this, the contractual contact is a 'but for' causative factor for the tort since it brought the parties within tortious 'striking distance' of each other." *Id.*

In *Bell Helicopter Textron, Inc. v. C&C Helicopter Sales, Inc.*, 2001 WL 290569 (N.D. Tex Mar. 21, 2001) (Kendall, J.), the court interpreted the requirement differently. It observed that "[t]he Fifth Circuit has stated that courts should evaluate whether the defendant 'had the necessary minimum contacts with Texas as a result of affirmative acts *performed in connection with* the subject matter of the litigation.'" *Id.* at *2 (quoting *Patterson v. Dietze, Inc.*, 764 F.2d 1145, 1146 (5th Cir. 1985)) (emphasis in original). It concluded that "[a]n identified contact will not support specific jurisdiction if it in no way relates 'to the merits' of the plaintiff's cause of action." *Id.*

The discussion of relatedness in *Harley-Davidson* is also relevant to this court's analysis. In an argument similar to the one that Pilote advances, the defendant contended that any contacts he had with the forum state were unrelated, reasoning that the case did not "arise out of services rendered or performed within the [forum state][.]" *Harley-Davidson*, 960 F. Supp. at 1391-92. The court considered this reasoning to be unduly narrow and observed that "the exercise of specific

jurisdiction is appropriate when the case is substantially related to the reason that the defendant has any contacts with the forum state." *Id*. at 1392.  The court ultimately held that the distribution agreement between the parties was the reason why the defendant had any contacts with the forum state, and that it was "substantially related" to the action before it where plaintiff sought a "determination of [its] rights and responsibilities under the agreement." *Id*.

Applying any of these understandings of relatedness to the facts of the instant case leads to the conclusion that AMX has made a prima facie showing that its breach of fiduciary duty claim arises out of or relates to Pilote's contacts with Texas.  According to AMX's petition, the existence of the fiduciary duty that Pilote owed AMX appears to depend on the fact that AMX granted Pilote an exclusive distributorship.  The court has already observed that the parties' relationship involves significant contacts with Texas.  Because AMX's allegation that Pilote owed it a fiduciary duty appears to depend on the parties' relationship, it can reasonably be said that, "but for" the relationship, AMX could not have suffered injuries stemming from a breach of a fiduciary duty that Pilote owed it.  Moreover, in accord with the court's understanding of the concept of relatedness, the parties' relationship is relevant to the merits of AMX's claim.  To make out such a claim, AMX will have to prove that Pilote owed it a fiduciary duty.  Based on the allegations of AMX's petition, such a duty appears to arise from the parties' relationship.  And Pilote's apparent argument that AMX's claims are not related to its contacts with Texas because they do not relate, or AMX has failed to provide evidence that they relate, to Pilote's purchases, payments, communications, or trips in Texas, fails for the same reason as did the defendant's argument in *Harley-Davidson*.  The parties' distribution relationship is the reason why Pilote had contacts with Texas, and it is sufficiently related to AMX's breach of fiduciary duty claim, which is allegedly based on that

relationship.

Accordingly, the court concludes that it may exercise specific jurisdiction over Pilote based on AMX's breach of fiduciary duty claim, because AMX has made a prima facie showing that Pilote had sufficient contacts with Texas and that the claim arises out of or relates to those contacts.[12]

3

Because the court can exercise specific jurisdiction over Pilote based on AMX's breach of fiduciary duty claim, it can exercise jurisdiction over Pilote as to AMX's other causes of action under the doctrine of pendent personal jurisdiction, because the other claims arise from the same set of operative facts. *See Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, 2004 WL 2550586, at *7 (W.D. Tex. Sept. 24, 2004) (exercising pendent personal jurisdiction over plaintiff's claims "that [arose] out of the same nucleus of operative fact" as claim over which court concluded it could exercise specific jurisdiction). Under this doctrine, "[o]nce a district court has jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same nucleus of material fact as the claim over which it has proper personal jurisdiction." *Id.* (citing *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002)); *see Nat'l "Write Your Congressman" Club, Inc. v. Jackson*, 1996 WL 707013, at *3 n.2 (N.D. Tex. Dec. 4, 1996) (Fitzwater, J.). AMX's breach of fiduciary claim, over which the court may exercise personal jurisdiction, is based on Pilote's failure to use its best efforts to market, sell, and distribute AMX products, to update its website with new AMX products, and to participate in organizing the September road show. Because each of AMX's

---

[12]Because the court holds that it can exercise specific jurisdiction over Pilote, it need not address AMX's argument that the court can also exercise general jurisdiction.

other claims are based on some or all of these same allegations, the court may exercise pendent personal jurisdiction over AMX's additional claims.

C

The court next determines whether requiring Pilote to litigate this suit in Texas comports with traditional notions of "fair play and substantial justice." *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 874 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). To determine whether exercising jurisdiction would satisfy traditional notions of fair play and substantial justice, the court examines "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." *Ruston Gas Turbines*, 9 F.3d at 421. "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Pilote's arguments fail to present a compelling case for why this court should not exercise personal jurisdiction. It argues, *inter alia*, that Texas has no interest in a business relationship that occurred in France, that AMX's interest in securing relief can be more efficiently satisfied in a French or Belgium court where the tribunals are more familiar with French law, that the interstate judicial system's interest in obtaining the most efficient resolution of controversies is best satisfied by allowing a European court to apply French law to a French controversy, and that the shared interest of the several states is best served by not exercising jurisdiction over a French entity that has no substantial contacts with Texas. The court has already concluded that Pilote has sufficient

- 28 -

contacts with Texas to warrant the exercise of personal jurisdiction.  Moreover, although Pilote posits that French law controls the present controversy, it has not yet demonstrated that this is so, and the court cannot now concur in this assertion concerning what law will control.  Additionally, although Pilote argues that evidence and witnesses regarding what Pilote did or did not do in France are located in Europe, not Texas, it has not proffered the particular nature and identity of these witnesses and evidence, and it has also failed to explain why this fact would render the exercise of jurisdiction over it unfair.  Texas has an interest in providing a forum to redress injuries sustained by its citizens, *see Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 780 (5th Cir. 1986), and Pilote has not provided the court with sufficient justification why proceeding in this forum would be unreasonable.

*    *    *

For the reasons set out, Pilote's September 27, 2004 motion to dismiss is denied, and the stay of discovery imposed by the court's January 5, 2005 order is lifted.[13]

**SO ORDERED**.

June 2, 2005.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[13]Because the court has decided this motion without holding an evidentiary hearing, Pilote is not foreclosed from challenging the evidence that AMX introduces at trial to support the exercise of personal jurisdiction.  *See Kinetic Concepts*, 2004 WL 2550586, at *7.

- 29 -