IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AMX CORPORATION,                   §
                                   §
     Plaintiff-counterdefendant,   §
                                   §   Civil Action No. 3:04-CV-2035-D
VS.                                §
                                   §
PILOTE FILMS,                      §
                                   §
     Defendant-counterplaintiff.   §

MEMORANDUM OPINION
AND ORDER

     In this lawsuit arising from the termination of a long-term
relationship between an American company and its French
distributor, the parties' cross-motions for summary judgment
present questions to be decided under Texas and French law.
Despite the plethora of claims and counterclaims, the court
concludes that comparatively few (and none governed by French law)
remain to be tried, and it grants in part and denies in part both
motions.

I

     Plaintiff-counterdefendant AMX Corporation ("AMX")[1] sues
defendant-counterplaintiff Pilote Films ("Pilote"), and Pilote
counterclaims, under various theories of liability arising from the
events surrounding the termination of an agreement under which
Pilote served as the exclusive distributor of AMX's products in

---

[1]AMX is now known as "AMX LLC."  P. July 11, 2006 Br. 1.
Although AMX's corporate form has apparently changed, there is no
suggestion that the court lacks diversity jurisdiction in this
removed case.

France.[2]  AMX, a Texas-based company, designs, develops, and markets hardware and software products for integrated control systems.  AMX entered into a distributorship agreement with Pilote on February 1, 1994 ("1994 Agreement"), under which Pilote became the sole distributor of AMX products in France.

The 1994 Agreement was for an initial term of one year unless sooner terminated in accordance with its provisions or extended for additional one-year terms by mutual written consent.  Pilote and AMX never extended the 1994 Agreement by written agreement.  They did, however, continue their relationship for the next ten years, during which Pilote acted as AMX's exclusive distributor in France.  The parties disagree about whether their relationship after February 1, 1995 was governed by an oral extension and modification of the 1994 Agreement or by a new, implied agreement arising under French law.

Through the course of its business relationship with AMX, Pilote developed a customer list of dealers in France who purchased AMX products.  Pilote considered this customer list to be a trade

---

[2]Because both parties have filed motions for summary judgment, the court will principally recount only the evidence that is undisputed.  If it is necessary to set out evidence that is contested, the court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  In this way it will comply with the standard that governs resolution of summary judgment motions.  *See, e.g., U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

secret, and it at all times maintained its confidentiality.  In April 2004 AMX scheduled a visit with Pilote in France to learn about the French market.  As part of the trip, AMX requested to visit some of Pilote's dealers.  Pilote complied with this request by introducing AMX to certain dealers, including TVSAT2 Design. Although Pilote introduced AMX to dealers, it did not authorize AMX to contact them or to use for any other purpose the information Pilote provided.  Pilote alleges that, from August 6, 2004 to January 2005, AMX sold at least $48,194.74 of products to TVSAT2 Design in France.

In May 2004 AMX notified Pilote in writing that it did not intend to renew the 1994 Agreement beyond the current term of February 1, 2005.  On June 9, 2004 AMX announced the appointment of a Regional Sales Support Manager for Europe, including France. Later that month, AMX invited Pilote to join AMX in organizing an informative road show (the "Road Show") to promote new AMX products to dealers and prospective dealers, planned for September 2004. Pilote failed to respond to this invitation and to three additional requests that AMX made in July 2004.  Because Pilote never responded, AMX sent invitations to French dealers and prospective dealers without being in a position to present Pilote's role in the events.

At the end of July 2004, Pilote responded to AMX's notice of nonrenewal.  Pilote stated, *inter alia*, that AMX could not

terminate the 1994 Agreement without compensating Pilote, and that AMX did not have the right to have its own Regional Sales Support Manager in France or to contact French dealers and prospective dealers to invite them to the September Road Show.

AMX filed this lawsuit in Texas state court, seeking a declaratory judgment and to recover on claims for breach of contract, breach of fiduciary duty, and tortious interference with prospective relations. Pilote removed the case to this court and filed counterclaims. It seeks to recover on claims for breach of contract, sudden breaking off an established business relationship, unfair competition under Texas and French law, trademark infringement, obtaining an advantage unrelated to a commercial service, common law misappropriation, misappropriation of trade secrets under the French Civil, Intellectual Property, and Labor Codes, trade secret misappropriation, restitution/unjust enrichment, conversion, tortious interference with an existing contractual and/or business relationship, breach of exclusivity by interference with a third party contract, and business disparagement under Texas and French law. Pilote and AMX have both filed motions for summary judgment,[3] and the court has heard oral

---

[3]AMX filed on September 20, 2006 objections to Pilote's evidence submitted in opposition to summary judgment. Specifically, AMX objects to Philippe Migeot's expert report, Bettina Hulsmeyer's affidavit, and various other documents. In view of the court's reasoning and the result reached in this decision, the court overrules the objections as moot.

argument.

## II

AMX and Pilote both move for summary judgment on claims asserted by the opposing party.  Because neither will have the burden of proof at trial on the other party's claims, each can obtain summary judgment by pointing the court to the absence of evidence to support an essential element of the claim in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once AMX or Pilote does so, the opposing party must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  Summary judgment is mandatory if the nonmovant fails to meet this burden.  *Little*, 37 F.3d at 1076.  An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial.  *Edgar v. Gen. Elec. Co.*, 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.) (citing *Celotex Corp.*, 477 U.S. at 323).

## III

AMX and Pilote both assert breach of contract claims, but they disagree about whether their relationship is governed by the 1994 Agreement or instead by a new, implied agreement that, for purposes

of deciding these motions, the court will call the "French Agreement."[4]  Each moves for summary judgment dismissing the other party's breach of contract claim.  In § III the court will address Pilote's motion directed to AMX's breach of contract claim, and in § IV it will decide AMX's motion concerning Pilote's claim.

A

Pilote contends that AMX's breach of contract claim fails because the 1994 Agreement expired by its own terms in 1995, AMX's claim is based on an expired contract, and the claim is barred by limitations.  Section 12 of the 1994 Agreement, entitled "Term," states: "[t]his Agreement shall be for an initial term of one (1) year from the date hereof unless sooner terminated in accordance with the provisions of Section 13 below.  By mutual written agreement, AMX and [Pilote] may extend this Agreement for additional one (1) year terms."  P. July 13 App. 10.[5]  It is undisputed that AMX and Pilote did not extend the 1994 Agreement in writing.

AMX contends the parties' contract did not expire until

_____

[4]AMX disagrees that there is a "French Agreement," and it refers to the term as a misnomer.  The court will use the term in this memorandum opinion and order as a matter of convenience.  The court holds *infra* at § IV(D) that Pilote cannot recover against AMX under the so-called French Agreement because it cannot establish the essential terms necessary for there to be a binding agreement under Texas law.

[5]Because the parties have filed multiple appendixes in briefing their cross-motions, the court will refer to each appendix by the date filed.

February 1, 2005.  It argues that although § 12 of the 1994 Agreement provided that the parties "may" extend the contract by written agreement, they were not required to do so; under the law a contract can be extended or modified by means other than writing, and AMX and Pilote orally modified the 1994 Agreement and extended it by their words and actions; and Pilote is estopped from asserting that the 1994 Agreement expired before February 1, 2005 because it has repeatedly taken the opposite position and has directly benefited from continuing to operate under the 1994 Agreement.

B

The court rejects AMX's principal argument, in which it seeks to read § 12 permissively to provide that the 1994 Agreement might, but need not, be extended in writing.

Under Texas law, "[i]n construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  "In construing an unambiguous contract, a court should attempt to harmonize and give effect to all provisions so that none is rendered meaningless." *Harmon v. 1401 Elm St. Condo. Ass'n-Insignia/Esc of Tex., Inc.*, 139 S.W.3d 411, 414 (Tex. App. 2004, no pet.) (citing *Coker*, 650 S.W.2d at 393; *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 139 (Tex. App. 1997, pet. denied)).  "No single provision taken alone will be

- 7 -

given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker*, 650 S.W.2d at 393. "No phrase, sentence, or section of a contract should be isolated and considered apart from the other provisions." *Trinity Prof'l Plaza Assocs. v. Metrocrest Hosp. Auth.*, 987 S.W.2d 621, 625 (Tex. App. 1999, pet. denied) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132 (Tex. 1994)). Moreover, "[i]t is logical to assume that . . . words [used in different clauses of the contract] were intended to convey the same meaning both times they were used." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 657 (5th Cir. 1999) (quoting *Nat'l Ropes v. Nat'l Diving Serv., Inc.*, 513 F.2d 53, 58 (5th Cir. 1975) (brackets and alterations in original)). When a word is used in one sense in one part of a contract, it is presumed to retain that same meaning throughout the contract, absent indications to the contrary. *Tenn. Gas Pipeline Co. v. FERC,* 17 F.3d 98, 105 (5th Cir. 1994) (citing *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex. 1990); *Johnson v. Dick,* 281 S.W.2d 171, 175 (Tex. Civ. App. 1955, no writ); *Green Ave. Apts., Inc. v. Chambers,* 239 S.W.2d 675, 685 (Tex. Civ. App. 1951, no writ)).

Section 12 of the 1994 Agreement states: "[t]his Agreement shall be for an initial term of one (1) year from the date hereof unless sooner terminated in accordance with the provisions of Section 13 below. By mutual written agreement, AMX and [Pilote]

may extend this Agreement for additional one (1) year terms." P. July 13, 2006 App. 10. The word "may" that AMX contends makes merely permissive the method of extending the contract by written agreement is the same word "may" that enables the parties to extend the 1994 Agreement at all. Therefore, if "may" is interpreted as a permissive term for purposes of determining the method by which the agreement can be extended, it must also be interpreted in the same way when construing the balance of the sentence in which it is found, absent indications to the contrary. Under AMX's reasoning, the court for consistency would be obligated to interpret the second sentence of § 12 to mean that AMX and Pilote could have extended the 1994 Agreement for additional one-year increments, but they could also have extended it in other increments (e.g., two, three, or perhaps more years), even though the initial term of the contract set out in the first sentence is one year and the second sentence provides for extensions in one-year increments. This is because the second sentence states that AMX and Pilote "may extend this Agreement for additional one (1) year terms," and AMX reads the word "may" permissively. But this interpretation would not read the two sentences that make up § 12 of the 1994 Agreement harmoniously. The first sentence would be read to contemplate an agreement renewable in one-year increments, and the second would view the duration of the extensions in permissive terms. This interpretation would also potentially require that the word "may"

be given two different meanings: the 1994 Agreement may be extended in writing, but also by another method, but it must be extended only for one-year increments.  And it would isolate and consider the word "may" apart from the other provisions in § 12 and give it controlling effect.

Properly interpreted, the permissive term "may" used in the second sentence of § 12 refers to the parties' option to extend the 1994 Agreement for additional one-year terms, not to the method they must use to effect the extension.  Accordingly, the court holds that although the 1994 Agreement makes permissive the decision to extend the contract, it makes mandatory the method of doing so: by mutual written agreement.

C

AMX also maintains that the 1994 Agreement could have been extended or modified through the parties' course of dealing and conduct, when they continued to do business in the same manner as they had during the contract's initial term, or by oral agreement. It posits that Pilote's motion must be denied because there is a fact question whether the 1994 Agreement was extended on this basis.

AMX cannot establish that the parties extended the 1994 Agreement through their course of dealing and conduct.  Under Texas law, when parties initially operate under an express contract but continue to operate in essentially the same manner after the

contract has expired, the rights of the parties are determined under implied contract principles. *See, e.g., Emmer v. Phillips Petroleum Co.*, 668 S.W.2d 487, 490 (Tex. App. 1984, no writ). The resulting contractual relationship stems from a new, implied contract, not an extension of the old, expired contract. *See id.* at 490-91 (holding that after express contract expired by its terms, if parties had rights and obligations toward each other, these existed under implied contract created by the acts and conduct of the parties after express contract expired); *Double Diamond Inc. v. Hilco Elec. Coop., Inc.*, 127 S.W.3d 260, 265-67 (Tex. App. 2003, pet. denied) (concluding that where contract expired but parties continued to deal with each other for two years as they had under previous contract, Texas law did not prohibit parties from impliedly extending agreement or entering into new agreement after written agreement expired, and holding that there was fact issue whether parties had entered into implied agreement); *Celadon Trucking Servs., Inc. v. Lugo's Sec. Agency*, 2005 WL 2401886, at *2 (Tex. App. Sept. 28, 2005, no pet.) (not designated for publication) (concluding there was fact issue as to whether contract existed when express contract expired but parties continued to act as if agreement was still in effect, and stating that "[w]hen the evidence consists of the conduct of the parties and their course of dealing with one another, then mutual agreement may be inferred from the circumstances, in which event the contract

is said to be 'implied' as opposed to being an 'express' contract."); *but cf. Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 347 (Tex. App. 2001, pet. denied) ("The parties here continued to perform under the July 1, 1991 maintenance contract even after it had expressly expired on July 1, 1992. . . [this, in combination with a letter agreement extending the contract on November 15, 1993] was sufficient evidence to support the trial court's finding that the maintenance contract of July 1, 1991, was in effect on April 28, 1993.").   The 1994 Agreement expired on February 1, 1995 because it was not extended by written agreement.   Accordingly, even if AMX and Pilote continued to operate in essentially the same manner after the 1994 Agreement expired, their rights would be determined under implied contract principles, not on the basis of an extension of the 1994 Agreement itself.

The court also rejects AMX's reliance on conversations, emails, and correspondence to argue that the parties extended the 1994 Agreement through oral modification.   The court recognizes, as AMX argues, that Texas law provides that "a written agreement not required by law to be in writing may be modified by a later oral agreement, even though it provides that it can be modified only in writing."   *Double Diamond*, 127 S.W.3d at 267 (citing *Mar-Lan Indus., Inc. v. Nelson*, 635 S.W.2d 853, 855 (Tex. App. 1982, no writ); *Adams v. Can-Dee Oil Corp.*, 357 S.W.2d 808, 808 (Tex. Civ.

- 12 -

App. 1962, writ ref'd n.r.e.)).  But assuming that this rule can be applied in the present context, AMX has not adduced sufficient summary judgment evidence to enable a reasonable jury to find that the parties orally agreed to modify and extend the 1994 Agreement. AMX has presented evidence of the parties' conduct and course of dealing——shipping products, providing services (e.g., promoting, selling, and distributing AMX products), and issuing written invoices——not of an explicit oral agreement to extend the 1994 Agreement.  As the court in *Double Diamond* explained, "[w]hen [the] evidence consists of the conduct of the parties and their course of dealing with one another, then mutual agreement may be inferred from the circumstances, in which event the contract is said to be 'implied' as opposed to being an 'express' contract.  *Id.* (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2D 607, 609 (Tex. 1972)).

Accordingly, subject to AMX's ability, addressed below, to establish that Pilote is estopped from denying that the 1994 Agreement did not expire until February 1, 2005, the court holds that the contractual relationship between AMX and Pilote was not governed by the 1994 Agreement.  To the extent any contractual relationship existed between AMX and Pilote, it was based on an implied contract.  AMX cannot recover for breach of an implied contract, however, because it has not pleaded (and it is now too late to assert) such a claim.  AMX only alleges a claim for breach

- 13 -

of the 1994 Agreement.[6]

                                    D

    AMX relies on theories of quasi-estoppel, equitable estoppel,
and judicial estoppel to argue that Pilote is precluded from
denying that the 1994 Agreement expired on February 1, 2005.  It
maintains that in a prior legal proceeding, Pilote repeatedly took
the opposite position; that Pilote has relied on the existence and
extension of the 1994 Agreement to charge AMX with wrongdoing; and
that Pilote has benefited by continuing to operate under the 1994
Agreement because it has maintained its exclusive distributor
status in France, orally modified the 1994 Agreement to extend its
distributorship to North African countries, asserted that AMX
violated the 1994 Agreement as a basis to persuade a Belgium trial
court to prevent AMX from conducting the Road Show in France, and
filed a grievance with a French governmental agency alleging that
AMX violated the 1994 Agreement.

    Pilote responds that its prior position was not inconsistent
with its argument that the 1994 Agreement expired on February 1,
1995, after which the parties' relationship was controlled by the
French Agreement, which included some of the terms of the 1994
Agreement.  It essentially maintains that the expired 1994
Agreement is evidence of what is included in the French Agreement

_____

    [6]AMX could have alleged an alternative claim for breach of an
implied agreement.  But because it has not done so, the court need
not consider whether such a breach claim would be viable.

                                 - 14 -

but is not dispositive of the parties' contractual relationship.

E

The court considers first AMX's reliance on quasi-estoppel. AMX argues that it would be unconscionable to allow Pilote to maintain that the 1994 Agreement expired by its own terms because Pilote previously asserted that the 1994 Agreement governed the parties' relationship and sought to enforce its own rights under the Agreement. AMX contends that between February 1, 1995 and the commencement of this lawsuit, Pilote accepted benefits of the 1994 Agreement.[7]  It therefore posits that Pilote is precluded by the doctrine of quasi-estoppel from taking an inconsistent position and arguing to this court that the 1994 Agreement no longer governs its actions.

Pilote replies that AMX has produced no evidence that Pilote's position has been inconsistent.  It argues that it has accepted benefits and performed duties under the French Agreement, not the expired 1994 Agreement.  Pilote also maintains that the expired 1994 Agreement was irrelevant to its claims against AMX Ltd. Belgium ("AMX Belgium") in the Belgium court.

---

[7]AMX also asserts as a basis for its quasi-estoppel theory that Pilote took the position before a Belgium judicial body that the 1994 Agreement governed the parties' actions.  It does not elaborate on that assertion, however, except as part of its contention that Pilote is judicially estopped from denying that the 1994 Agreement did not expire until February 1, 2005.  The court will therefore address the argument in connection with judicial estoppel rather than quasi-estoppel.  *See infra* § III(G).

- 15 -

"Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App. 1994, writ denied).   "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."   *Id.* (citing *Atkinson Gas Co.*, 878 S.W.2d at 240; *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765-66 (Tex. App. 1992, writ denied)).   "[Q]uasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects."   *Atkinson Gas Co.*, 878 S.W.2d at 240 (citing *Mexico's Indus., Inc. v. Banco Mex. Somex, S.N.C.*, 858 S.W.2d 577, 581 n.7 (Tex. App. 1993, writ denied); *Turcotte v. Trevino*, 499 S.W.2d 705, 712-13 (Tex. Civ. App. 1973, writ ref'd n.r.e.)).   "The doctrine essentially requires (1) a previous action and (2) a subsequent inconsistent action which is thereby sought to be estopped."   *Mulvey v. Mobil Producing Tex. & N.M. Inc.*, 147 S.W.3d 594, 607 (Tex. App. 2004, pet. denied).

AMX has adduced facts from which a reasonable jury could find that Pilote took the position that the 1994 Agreement applied and is now taking an inconsistent position in this case.   For example, in a letter that Bettina Hulsmeyer ("Hulsmeyer"), Pilote's General

- 16 -

Manager, wrote in response to AMX's notice of nonrenewal, she referred specifically to the 1994 Agreement——which she called the "Distributorship Agreement"——stating, *inter alia*, that there was no reason to terminate the agreement because Pilote did not break any of the clauses on which AMX relied. P. July 13, 2006 App. 153. A jury could find that Pilote was invoking the 1994 Agreement to control AMX's right to terminate the parties' relationship.

Pilote replies that AMX fails to acknowledge Hulsmeyer's statement in the same letter that "[b]y not presenting Pilot[e] Films a written extension, the Distributorship Agreement presents now, after ten years of commercial relationship, a character of indefinite term, which cannot be terminated by AMX at the date of January 31st 2005 without any reasonable compensation to Pilote Films." *Id.* It contends that a reasonable jury could infer from this statement that Pilote did not believe the parties were operating under the 1994 Agreement as written. Although this argument may persuade the jury to find against AMX on its quasi-estoppel theory, the court cannot say that a reasonable jury would be unable to find from other record evidence (including other statements that Hulsmeyer made in the same letter), that Pilote accepted the benefits of the 1994 Agreement and later took the inconsistent position that the agreement was not controlling, in order to avoid corresponding obligations or effects.

AMX also relies on evidence of Pilote's submission of the 1994

Agreement to the *Direction Régionale de la Concurrence, de la Consommation et de la Répression des Fraudes*, a French governmental agency that investigates allegations of business practices that violate French law.   AMX cites a September 3, 2004 letter that Hulsmeyer submitted to the French agency that referred to an earlier telephone conversation with an agency representative and stated: "As agreed, I am sending you a copy of our exclusive contract signed in February 1994 with this same manufacturer, and this to give you more information about our relationship with it." P. July 13, 2006 App. 234.

Pilote argues in reply that the evidence it submitted was necessary to support its argument that the French Agreement included an exclusivity provision, as established by the expired 1994 Agreement, and that this proof was provided for the purpose of giving the agency more information about the parties' relationship. Pilote points out that Hulsmeyer did not state in the letter that the 1994 Agreement controlled the relationship.

This evidence would not alone permit a reasonable jury to find that Pilote was estopped from asserting that the 1994 Agreement had expired.   Viewed in isolation, it shows that Pilote provided a French governmental agency a copy of the 1994 Agreement so that it would have more information about the parties' relationship. Hulsmeyer's letter stated that was her intent in enclosing a copy of the 1994 Agreement.   She did not claim that the 1994 Agreement

- 18 -

itself was currently in effect.  But in combination with other evidence that AMX has adduced——including the content of Hulsmeyer's letter to AMX in response to its notice of nonrenewal——a reasonable jury could find that the submission was part of Pilote's continuing effort to rely on the 1994 Agreement to control the AMX-Pilote relationship after February 1, 1995.[8]

Accordingly, the court concludes that AMX has adduced sufficient evidence from which a reasonable jury could find that Pilote is precluded based on quasi-estoppel from defeating AMX's breach of contract claim on the ground that the 1994 Agreement expired.

F

AMX next argues that Pilote is equitably estopped from denying that the 1994 Agreement expired before February 1, 2005.  It maintains that Pilote knowingly concealed its belief that the agreement expired, intending that AMX unknowingly rely to its detriment on that concealment.  AMX posits that Pilote's failure to inform AMX that it believed the 1994 Agreement had expired and that the parties were operating under a new agreement pursuant to French law worked a detriment to AMX because it was unable to hire a lawyer and negotiate the terms of the French Agreement.  It argues

---

[8]Of course, the jury could also find, as Pilote argues, that Pilote was citing the 1994 Agreement as the source of the exclusivity provision of the French Agreement.  But this is an issue for the jury to decide.

that, had it known this was occurring, it would not have accepted Pilote's proposal and would have discontinued the parties' relationship.

Pilote responds that AMX cannot rely on equitable estoppel because it possessed the means of acquiring knowledge that the 1994 Agreement had expired since it had a copy of the agreement and thus had constructive knowledge of the contract's extension clause. Therefore, AMX could have known that the 1994 Agreement had expired by its own terms and that the parties were in fact operating under an implied contract under French law.

Equitable estoppel arises where, by the fault of one, another is induced to change its position for the worse. *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 736 (Tex. App. 1994, writ denied). It is established when (1) a false representation or concealment of material facts, (2) is made with knowledge, actual or constructive, of those facts, (3) with the intention that it should be acted upon, (4) to a party without knowledge or means of obtaining knowledge of the facts, (5) who detrimentally relies on the representations. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998) (citing *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991)).

As a threshold matter, the court observes that AMX's position, if accepted, would appear to undermine settled Texas law governing the establishment of implied contractual relationships after an

express contract expires. *See e.g., Emmer*, 668 S.W.2d at 490; *Double Diamond, Inc.*, 127 S.W.3d at 267. Under AMX's argument, a party seeking to defeat the terms of an implied contractual relationship could always argue that the opposing party's silence concerning the expiration of the express contract equitably estopped it from contending that the parties had entered into an implied contract. Yet implied contracts necessarily arise from the conduct of the parties and their course of dealing with one another. *See Double Diamond, Inc.*, 127 S.W.3d at 267. And that conduct will often be marked by at least one party's silence regarding the fact that the express contractual relationship has ended and an implied contractual relationship has begun.

But the court need not decide whether AMX's equitable estoppel theory is even plausible under Texas law because a reasonable jury could not find that AMX has met all the required elements of this doctrine. Among the requirements for equitable estoppel is that AMX was without knowledge or means of obtaining knowledge of the facts. AMX had a copy of the 1994 Agreement and could have correctly interpreted it, as has the court above, *see supra* § III(B), to mean that the parties were obligated to extend the agreement by mutual written agreement. AMX was also aware that the parties had not done so. It therefore had the means of knowing that the 1994 Agreement had expired and that the parties were operating under an implied contract. AMX cannot rely on equitable

estoppel to recover from Pilote under the 1994 Agreement.

G

AMX also relies on the doctrine of judicial estoppel to defeat Pilote's contention that the 1994 Agreement expired.  It argues that Pilote brought suit against AMX U.K., Ltd. ("AMX UK") (AMX's affiliate) in Belgium, specifically relying on the 1994 Agreement to establish that Pilote and AMX had an exclusive distributorship agreement, signed February 1, 1994, and that AMX was not permitted to promote its products in a number of cities during the Road Show in France.  AMX cites Pilote's argument before the Belgium court that it had an exclusive representation agreement with AMX, and that

> this agreement was entered into for one year and . . . was tacitly renewed during a period of ten years . . . [and] without waiting until the end of the agreement in 2005, a "*Road Show*" was organized for the current month (September 2004) . . . in violation of the exclusivity agreement that is in force.

P. July 13, 2006 App. 191.  AMX maintains that Pilote is judicially estopped from taking a contrary position in this court because Pilote persuaded the Belgium court to rule in its favor——i.e., to hold that AMX was precluded under the 1994 Agreement from conducting the September 2004 Road Show——based on the contention that it had an exclusive distributorship under the agreement.  It contends that Pilote submitted the 1994 Agreement and at no time referred to an alleged French Agreement.

- 22 -

Pilote responds that it did not take an inconsistent position in the Belgian litigation, and, if it did refer to the 1994 Agreement, the reference was unintentional and inadvertent. It maintains, as it has in opposing AMX's other estoppel arguments, that in Belgium it merely argued that the French Agreement included an exclusivity provision, which it relied on to support an extracontractual claim against AMX Belgium. It contended that AMX Belgium, a division of AMX UK, was helping AMX violate that agreement by assisting AMX in organizing a Road Show in France. Pilote posits that although it distinguished the contract claims in this court from those in the Belgium tribunal, AMX Belgium tried to insert the expired 1994 Agreement into the Belgium proceeding. It asserts that AMX is citing Pilote's statements to the Belgium court out of context and that, read properly, they are consistent with Pilote's position that although the exclusivity provision originated in the 1994 Agreement, it continued in effect for ten years thereafter as a term of the implied French Agreement. Pilote also argues that AMX is misrepresenting to this court that Pilote asserted in the Belgium tribunal that Texas law applied; instead, AMX UK advanced arguments under Texas law. It contends that if it did take inconsistent positions, any implied reference to the 1994 Agreement was inadvertent.

"The doctrine of judicial estoppel bars a party who successfully maintains a position in a prior judicial proceeding

from afterward adopting an inconsistent position if so doing would result in prejudice to his adversary." *Moore v. Neff*, 629 S.W.2d 827, 829 (Tex. App. 1982, writ ref'd n.r.e.) (citing *Long v. Knox*, 291 S.W.2d 292, 295 (Tex. 1956); *Yarber v. Pennell*, 443 S.W.2d 382, 384 (Tex. Civ. App. 1969, writ ref'd n.r.e.); *Van Deusen v. Conn. Gen. Life Ins. Co.*, 514 S.W.2d 951 (Tex. Civ. App. 1974, no writ)). "[T]he doctrine is intended to protect the integrity of the judicial system and to prevent a party from 'playing fast and loose' with the courts to suit the party's purposes." *Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 899 (Tex. App. 2004, no pet.) (quoting *Stewart v. Hardie*, 978 S.W.2d 203, 208 (Tex. App. 1998, pet. denied)).

> The elements of judicial estoppel are (1) a sworn, prior inconsistent statement made in a prior judicial proceeding; (2) the successful maintenance of the contrary position in the prior action; (3) the absence of inadvertence, mistake, fraud, or duress in the making of the prior statement; and (4) the statement was deliberate, clear, and unequivocal.

*Id.* (citing *DeWoody v. Rippley*, 951 S.W.2d 935, 944 (Tex. App. 1997, pet. dism'd by agr.)).

AMX has presented a fact issue that prevents summary judgment rejecting its judicial estoppel theory. A reasonable jury could find from the evidence presented in the summons from the Belgian court that Pilote relied on the continuing validity of the 1994

Agreement in the Belgian proceedings,[9] was successful in those proceedings and was able to use the 1994 Agreement to stop the actions of AMX Belgium, and that Pilote is only now attempting to take an inconsistent position and argue that the parties' relationship was controlled by an implied French Agreement. The possibility that AMX may prevail on a judicial estoppel or quasi-estoppel theory, and thereby bar Pilote from arguing that the 1994 Agreement does not control, precludes the court from granting Pilote's motion for summary judgment on AMX's breach of contract claim.

IV

The court next considers whether AMX is entitled to summary judgment dismissing Pilote's breach of contract counterclaim.

A

Pilote alleges that AMX breached the French Agreement by placing an agent to work in Pilote's exclusive territory, conducting road shows in the exclusive territory without Pilote, and directly contacting Pilote's dealers and/or customers. Alternatively, if the court determines that the relationship between AMX and Pilote is governed by the 1994 Agreement, Pilote asserts that AMX breached that contract through the same actions.

_____

[9]A reasonable jury could also find that Pilote did not maintain the position that the 1994 Agreement still governs, but simply used it as evidence of the terms of an implied contract that arose when the 1994 Agreement expired. But this is a question for the jury to decide.

AMX moves for summary judgment on this counterclaim, arguing that Pilote has failed to prove the existence of the alleged French Agreement or of any of its material terms.   It maintains that Pilote cannot point to a single discussion, negotiation, or agreement with anyone at AMX regarding the alleged French Agreement, or of its contractual terms, and that Hulsmeyer's testimony shows that no such agreement was clearly established. AMX argues that Pilote has recently asserted for the first time that the French Agreement is an implied agreement that contains some of the terms of the 1994 Agreement, but that Pilote cannot adduce evidence sufficient to support the finding of an implied agreement; that Pilote cannot successfully assert that the French Agreement arose and operated under French law because Pilote would be required by French law to prove that AMX expressly agreed to every material term included in the contract, which it cannot do in light of Hulsmeyer's contrary testimony; and that if Pilote relies on Texas law to establish that the French Agreement is enforceable, it must prove all material terms in the agreement, which it cannot do.   AMX cites three specific allegations that Pilote makes concerning how AMX breached the alleged French Agreement, and it argues that Pilote cannot recover on any of them because it lacks evidence that the French Agreement ever existed or that AMX expressly agreed to be bound by a specific contractual term that

would have prevented AMX's conduct.[10]

Regarding Pilote's alternative claim for breach of the 1994 Agreement, AMX contends that, assuming there was a breach, Pilote's damages are limited. Relying on a contractual limitation-of-liability clause, AMX posits that Pilote cannot recover lost profits, consequential, or related damages and, alternatively, that Pilote is precluded from recovering contractual damages allegedly incurred after February 1, 2005, when AMX properly notified Pilote that it was not renewing the contract.

Pilote responds that the terms of the French Agreement are a question of fact; that after AMX and Pilote failed to extend the 1994 Agreement in writing, the parties' relationship was governed under French law by a *contrat de concession exclusive* because they continued their business relationship for a period of ten years; that under the French Commercial Code, the continuation of the relationship by both parties and the nature of the obligations of both parties can be proved by any means; that this is similar to Texas law governing implied contracts, under which a contract ends and the parties continue in a commercial relationship; that the

---

[10]AMX also maintains that to the extent a French Agreement existed, Pilote's claim for damages for any purported breach of the contract would be limited, because the agreement would have expired at the latest on February 1, 2005, and Pilote cannot recover damages after that date. AMX also contends that even if an implied exclusive distributorship agreement arose under French law, it expired on February 1, 2005 (ten years after the French agreement began). Because the court holds that Pilote cannot recover under the French Agreement, it need not address these arguments.

terms of the French Agreement can be proved by any means, including documents, conversations, actions, or anything else; that it has consistently pleaded that the French Agreement arose under French law after the 1994 Agreement expired and that Hulsmeyer explained in her deposition the material terms of the agreement; and that the summary judgment evidence is sufficient for a jury to determine the terms of the French Agreement.

Pilote also argues that § 14 of the 1994 Agreement does not limit all damages but restricts only those incurred by reason of termination or nonrenewal.   Therefore, if the 1994 Agreement governs the parties' relationship, § 14 would not limit damages before termination of the contract and, after termination, would only limit those directly caused by the termination.   This would still allow Pilote to recover damages not related to AMX's termination of the agreement.

Pilote argues that applying the "most significant relationship" test prescribed by § 6 of the Restatement (Second) of Conflict of Laws Restatement ("Restatement"), French law controls. It contends that if even Texas law applies, Pilote's French Agreement claims still exist.

B

It is well settled that "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary." *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002)

- 28 -

(citing *W.R. Grace & Co. v. Continental Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990); *Nat'l Union Fire Ins. v. CNA Ins. Cos.*, 28 F.3d 29, 32 n.3 (5th Cir. 1994)).  In that case, the court would simply apply forum law to the dispute.  *Id.*  Based on the arguments of the parties, and Pilote's failure to refute AMX's explanation of French law, the court acknowledges that it is possible that the laws of France and Texas on the formation of an implied contract are essentially the same.  AMX provides only the testimony of its expert, Philip R. Kimbrough ("Kimbrough"), to support the contention that a party seeking to establish an implied contract under French law must adduce evidence that the parties agreed to every material term.  The court is unable to determine from AMX's evidence whether Kimbrough's opinion is supported by French law. Because of the uncertainty regarding French law on the requirements for an implied conflict, and because the court would apply Texas law under either scenario, it will perform a complete choice-of-law analysis.

C

1

To decide whether French or Texas law controls, the court applies the choice-of-law rules of Texas, the state in which it sits.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  "In Texas, when, as here, a contract does not contain an express choice-of-law provision, a court must determine whether a

relevant statute directs the court to apply the laws of a particular state." *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 340 (Tex. App. 2004, pet. denied). When no statutory directive governs in a contract dispute, Texas courts apply the "most significant relationship" test set out in §§ 6 and 188 of the Restatement. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984) ("[I]n all choice of law cases, except those contract cases in which the parties have agreed to a valid choice of law clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue."). No statute controls the agreement between AMX and Pilote. The court must therefore determine whether France or Texas bears the most significant relationship to the contractual relationship at issue.

Under the "most significant relationship" test, the court considers several factors to determine which forum has the most significant relationship to the litigation. *See* Restatement (Second) of Conflict of Laws § 6(2) (1971). These include (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and

uniformity of result, and (7) ease in the determination and application of the law to be applied. *Id.* The contacts the court should consider in applying these principles to a contract dispute include (1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the contract's subject matter, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2) (1971). "Once these contacts are established, the question of which . . . law will apply is one of law." *Duncan*, 665 S.W.2d at 421 (citing *Guiterrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979)). "[T]he number of contacts with a particular state is not determinative." *Id.* "Some contacts are more important than others because they implicate state policies underlying the particular substantive issue." *Id.* "Consequently, selection of the applicable law depends on the qualitative nature of the particular contacts." *Id.* (citing *Guiterrez*, 583 S.W.2d at 319).

2

The court considers first the relevant contacts with France and Texas. It is undisputed that the 1994 Agreement was contracted and negotiated in Texas. Section 18, entitled "Governing Law: Venue," contains the following provision:

> This Agreement shall be deemed to have been executed and delivered and is to be performed in part in the State of Texas, United States of America.

- 31 -

P. July 13, 2006 App. 12.  But unless estoppel applies (and the court will assume for purposes of its choice-of-law analysis that it does not), the 1994 Agreement did not control the parties' relationship after February 1, 1995.[11]  To the extent the parties had any contractual relationship after that, it was based on an implied contract.  AMX and Pilote would not have contracted or even negotiated the implied contract; it would have arisen from the conduct of AMX and Pilote after February 1, 1995.  As discussed below, this conduct occurred both in Texas and in France.

The court next considers together the place of performance and the location of the contract's subject matter.  It concludes that the contract was performed and its subject matter was located in both Texas and France.  AMX's products were developed and produced in Texas; Pilote transmitted its purchase orders to Texas and paid for the products by direct wire transfers to AMX's Texas bank account; AMX's products were delivered to common carriers in Texas for shipment to Pilote, such that ownership changed hands in Texas; Pilote's employees visited AMX's Texas offices for business and training purposes; and Pilote's officers visited Texas several times to conduct business with AMX.  On the other hand, the subject

---

[11]Because the outcome of the court's choice-of-law analysis would be the same regardless whether the 1994 Agreement controlled the parties' relationship only through February 1, 1995 or lapsed at that time, the court need not undertake the potentially more difficult task of factoring AMX's estoppel arguments into the equation.

of the relationship between AMX and Pilote was marketing and selling AMX products in the French market, and Pilote promoted and distributed AMX's products, and performed related services, in France.  The court holds that the place of performance and location of the contract's subject matter point to both Texas and France.

Finally, the domicile, residence, nationality, place of incorporation, and place of business of the parties point to both Texas and France, because AMX is a Texas corporation and Pilote is a French company that is akin to a limited liability company.

Considering the relevant contacts of AMX and Pilote does not yield a clear answer as to which law applies.  But application of the most significant relationship test does not turn simply on the number of contacts each forum has with the controversy.  *See Albany Ins. Co v. Anh Thi Kieu*, 927 F.2d 882, 891 (5th Cir. 1991).  The court next considers the § 6 principles to determine whether Texas or France has a greater interest in the outcome of the litigation.

The court begins with factors one, three, and five: the needs of the interstate and international systems, the relevant policies and relative interests of other interested states in the determination of the particular issue, and the basic policies underlying the particular field of law.  Pilote correctly points out that France's choice-of-law principles are immaterial to this court's choice-of-law determination.  But the choice-of-law principles that France would apply to a distribution agreement do

shed light on the relative interest France has in applying its own laws to a contract of this type.  Under French choice-of-law principles, if the contract is a distributorship agreement, French courts apply the law of the manufacturer's, rather than of the distributor's, residence.  *See* P. July 31, 2006 FLA App. 52-53.[12] Thus it appears that a French court faced with this dispute would apply Texas rather than French law.  This suggests that France's interest in this dispute is less significant, and that France does not have a strong need for its own laws to be applied.

Texas, on the other hand, does have an interest in applying its laws to distribution contracts when the goods are manufactured in Texas and delivered to common carriers in Texas, and when the payment for the goods is handled through Texas banks.  Texas's interest in applying its own laws may be diminished by the fact that this contract is not solely for the sale of goods, but also involves the performance of services, many of which took place in France.  But because France's choice-of-law principles would dictate the application of Texas law——despite the fact that many of the services involved in this distributorship agreement occurred in France——the court concludes that factors one, three, and five

---

[12]AMX had filed two appendixes in support of its motion for summary judgment, and the page numbers in each overlap to some extent.  *Cf.* N.D. Tex. Civ. R. 56.6(b)(1) (requiring one appendix "assembled as a self-contained document").  The court will therefore refer to the one that contains "French Legal Authorities" as "FLA App."

weigh in favor of applying Texas law.

Factor four considers the protection of justified expectations of the parties which, in this case, also weighs in favor of applying Texas law.  The 1994 agreement contained a choice of law provision that states, in pertinent part, that "[t]he substantive laws of the State of Texas, excluding any conflicts of law or principle that might otherwise refer to the substantive law of another jurisdiction, shall govern the interpretation, validity and effect of this Agreement."  P. July 13, 2006 App. 12.  Pilote and AMX both agreed to this provision.  Although the 1994 Agreement expired by its terms on February 1, 1995 and no longer controls the relationship between AMX and Pilote, it is nonetheless helpful in determining the expectations of the parties.

The terms of the 1994 Agreement corroborate the finding that, from the beginning, AMX and Pilote both knew and explicitly agreed that their relationship would be governed by Texas law.  There is no evidence that they ever agreed to a different choice-of-law provision or that it was implied or agreed that they expected to be bound by French law.  Thus there is no reason to conclude that either expected French law to govern.  The evidence suggests that AMX and Pilote both expected their relationship to be governed by Texas law.  The court therefore concludes that factor four weighs in favor of applying Texas law.

Finally, factor seven, which assesses the ease in the

determination and application of the law to be applied, weighs in favor of applying Texas law. Although this court is capable of applying French law to this contract dispute, its familiarity with Texas law is far superior.

Based on the above, and balancing the relevant interests of France and Texas, the court concludes that Texas has the most significant relationship to the present dispute and that therefore Texas law governs the contractual relationship between AMX and Pilote.[13]

D

The court now considers whether, under Texas law and on the facts that Pilote has produced, Pilote can show that the so-called French Agreement is an enforceable contract.

1

Texas courts will imply a contractual relationship "when the facts and circumstances surrounding the parties' relationship imply a mutual intention to contract." *Harrison v. Williams Dental Group, P.C.*, 140 S.W.3d 912, 916 (Tex. App. 2004, no pet.) (citing *Haws & Garrett Gen. Contractors, Inc.,* 480 S.W.2d at 609). For a contract to be enforceable, however, the parties must have agreed

---

[13]Because the court has determined that Texas law governs the contractual relationship between AMX and Pilote, and since it dismisses below all of Pilote's French-law claims, the court denies the following three motions as moot: AMX's July 31, 2006 motion to exclude expert testimony, AMX's September 26, 2006 motion for leave to file motion for leave to designate French-law expert, and AMX's March 2, 2007 supplemental motion to exclude expert testimony.

on the essential terms.[14]  *T.O. Stanley Boot Co. v. Bank of El Paso*,

847 S.W.2d 218, 221 (Tex. 1992).  An "essential" term is

> one that the parties reasonably regarded, at
> the time of contracting, as a vitally
> important ingredient in their bargain. Failure
> to fulfill such a promise, in other words,
> would seriously frustrate the expectations of
> one or more of the parties as to what would
> constitute sufficient performance of the
> contract as a whole.

*Neeley v. Bankers Trust Co. of Tex.*, 757 F.2d 621, 628 (5th Cir.

1985).  If an agreement is so indefinite that a court cannot

determine the legal obligations and liabilities of the parties, it

is not an enforceable agreement.  *Moore v. Dilworth*, 142 Tex. 538,

179 S.W.2d 940, 942 (1944).  "Whether an agreement fails for

indefiniteness is a question of law to be determined by the court."

*COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664 (Tex. App.

2004, pet. dismissed) (citing *Castroville Airport, Inc. v. City of

Castroville*, 974 S.W.2d 207, 211 (Tex. App. 1998, no pet.); *Am.'s

Favorite Chicken Co. v. Samaras*, 929 S.W.2d 622 & n.3 (Tex. App.

1996, writ denied)).

    "The rules regarding indefiniteness of material terms of a

---

[14]Several cases that the court cites to support its analysis
involve express rather than implied contracts.  The law stated in
these cases applies with equal force to implied contract cases,
however, because "the elements of a contract, express or implied,
are identical."  *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d
707, 710 (Tex. App. 1989, no writ.); *see also Leal v. Weightman*,
2004 WL 2251570, at *4 (Tex. App. Oct. 7, 2004, no pet.) (finding
no implied contract when party did not produce more than scintilla
of evidence of essential terms).

contract are based on the concept that a party cannot accept an offer to form a contract unless the terms of that contract are reasonably certain." *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 133 (Tex. App. 2005, pet. denied) (citing Restatement (Second) of Contracts § 33(1)(1981)).  Although "Texas courts prefer to validate transactions rather than void them . . . court[s] may not create a contract where none exists and they generally may not interpolate or eliminate material terms." *Ski River Dev., Inc.*, 167 S.W.3d at 133  (citations omitted).  "A contract will fail for indefiniteness if evidence is not presented on all essential terms." *Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App. 2004, no pet.) (citing *T.O. Stanley Boot Co.*, 847 S.W.2d at 221-222); *see, e.g., Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 847 (Tex. 2000) (holding that alleged contract was unenforceable where it lacked evidence of essential term of amount or percentage of payment to be received); *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 801-02 (Tex. App. 2005, no pet.) (concluding that oral statement that employee would be "compensated" fails for indefiniteness because there is no evidence of essential terms such as price, whether payment would be in cash or in an equity interest, and, if in an equity interest, the method of compilation of value, and source of equity interest); *Meru*, 136 S.W.3d at 391 (holding there was no evidence that parties had agreed to sum certain in alleged agreement to pay bonus).

- 38 -

2

AMX argues that Pilote has not established the existence of an enforceable, implied agreement (the French Agreement) because Pilote must, but cannot, establish all the material terms of the agreement. It points to the absence of evidence of any discussion of a French Agreement with anyone at AMX, and of proof from which the essential terms of the French Agreement can be determined. And it maintains that each ground on which Pilote relies to allege a breach of contract must fail because it cannot show that AMX agreed to the contractual term on which Pilote relies.

Apart from relying on French law[15]——which the court need not consider in view of its decision that Texas law controls——Pilote responds that the terms of the French Agreement are a question of fact. It maintains that the record contains ample evidence that would permit a jury to determine the terms of the French Agreement.[16] But the threshold question whether an enforceable

---

[15]Because Pilote acknowledges that proof of the alleged contract under French law is similar to proof of an implied contract under Texas law, its offer of proof would apparently be substantially the same under either law.

[16]In support of this assertion, Pilote purports to rely on evidence that AMX submitted in opposing Pilote's motion to dismiss and to incorporate that evidence by reference. This reliance violates Rule 56.6(a) and (b)(1) and Rule 56.5(c). Under Rule 56.6(a) and (b)(1), Pilote must include its evidence in an appendix, which must be assembled as a self-contained document. All evidence on which Pilote relies must be included in its appendix, not incorporated by reference from evidence filed with respect to a separate motion. And under Rule 56.5(c), Pilote must cite each page of the appendix that supports each assertion that it

contract even exists is one of law to be determined by the court. *See Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 814 (Tex. App. 1987, writ ref'd n.r.e.) ("Whether an agreement is legally enforceable or binding is a question of law"); *Am.'s Favorite Chicken Co.*, 929 S.W.2d at 622 ("the issue of whether an agreement fails for indefiniteness is a question of law to be determined by the court.").

Having considered the evidence on which Pilote relies, the court concludes as a matter of law that the essential terms of the French Agreement are too indefinite to be enforceable. In moving for summary judgment, AMX has pointed to the absence of evidence of the essential elements of the alleged French Agreement. Pilote thus has the burden of producing evidence of the material terms of the implied contract. *Celotex Corp.*, 477 U.S. at 324.

In its response, Pilote adduces evidence that the implied French Agreement included an exclusive distributorship provision. It points to the testimony of Hulsmeyer, in which she stated:

> My understanding is that AMX granted [Pilote] the exclusive right to market and to sell AMX products into the French market without interfering in any way and that on the way back, [Pilote] granted to AMX to not market and sell products that might have been competitive with the AMX products.

─────────────────────

makes concerning the summary judgment evidence. Even had Pilote included these documents in its appendix, it is not permitted to cite 582 pages of documents and rely on them *en masse*, without citing each appendix page.

D. Aug. 28, 2006 Br. 9.  Pilote also cites a letter in which an AMX executive wrote that the agreement with Pilote establishes it as the exclusive distributor in the region.  It also relies on statements in letters and emails that refer to a "contract," "agreement," and "manufacturer and distributor."  *Id.* at 13.

But Pilote has not adduced evidence of even one other term of the implied agreement.  Although it maintains that the parties impliedly adopted some provisions of the 1994 Agreement, Pilote does not point to any evidence that they agreed to continue to operate under any particular terms.  It cites collectively to 582 pages in AMX's appendix as evidence of the conduct between the parties after February 1, 1995,[17] but points to no specific evidence that would establish which, if any, of the terms of the 1994 Agreement were adopted.

Pilote's proof does not address, for example, the prices at which Pilote would purchase and sell AMX's products; the duration of the relationship; the method by which the relationship could be terminated; the law that would govern the relationship; or any of Pilote's corresponding contractual obligations, such as the

---

[17]This method of citing the record is improper.  *See, e.g.,* *Akop v. Goody Goody Liquor, Inc.*, 2006 WL 119146, at *3 n.4. (N.D. Tex. Jan. 17, 2006) (Fitzwater, J.) (holding that plaintiffs' citation to entire 137-page appendix was inadequate under Rule 56.5(c) because it dramatically increased burden on court to locate evidence on which summary judgment nonmovant relied) (citing *Hagen v. BeautiControl Cosmetics, Inc.*, 1999 WL 451228, at *4 n.2 (N.D. Tex. June 28, 1999) (Fitzwater, J.)).

requirement that Pilote meet certain sales quotas. Such terms would all be considered essential to a contract under which Pilote would serve as AMX's exclusive distributor in France. *See, e.g. Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App. 1989, no writ) ("A lack of definiteness in an agreement may concern the time of performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred." (citing *Terrell v. Nelson Puett Mortgage Co.*, 511 S.W.2d 366, 369 (Tex. Civ. App. 1974, writ ref'd n.r.e.)). Because the purported exclusive distribution agreement would require AMX to relinquish complete control over the promotion and sale of its products in France, it would be expected that the essential terms of the agreement would at a minimum include provisions designed to protect AMX's interests. The sole contractual term for which Pilote provides evidence is Pilote's agreement to serve as AMX's exclusive distributor in France and AMX's agreement not to interfere. But even if Pilote's evidence establishes that Pilote agreed to be AMX's exclusive distributor in France, an agreement on this single provision would not be enough of itself to address all essential terms of a contractual agreement.

Accordingly, the court holds that AMX is entitled to summary judgment dismissing Pilote's counterclaim for breach of the French

Agreement.[18]

E

Pilote alleges in the alternative that AMX breached the 1994 Agreement.  AMX seeks summary judgment limiting Pilote's damages on the basis that the 1994 Agreement contained a limitation-of-liability clause.[19]  AMX argues that Pilote cannot recover any damages as a result of the decision not to renew the contract and thus is not entitled to any damages that it seeks under this claim. AMX asserts in the alternative that Pilote cannot recover contractual damages incurred after February 1, 2005, the date on which it says it properly terminated the agreement.

Pilote argues that AMX reads § 14 too broadly.  It maintains that because the clause is explicitly limited to damages incurred "by reason of the termination or nonrenewal," it does not limit any damages incurred before termination of the contract; that after termination of the contract, § 14 only limits damages directly caused by the termination; and that it can recover damages not

---

[18]In view of this conclusion, the court need not address whether Pilote's damages are limited to those incurred before February 1, 2005.  *See supra* note 10.

[19]AMX broadly states that the court should grant its summary judgment motion because all of Pilote's counterclaims fail as a matter of law.  Although AMX seeks to limit the damages Pilote can recover under the 1994 Agreement, it does not point the court to the absence of evidence to support Pilote's alternative claim for breach of the 1994 Agreement.  Assuming that AMX intended to move for summary judgment on the alternative claim, it did not discharge its initial summary judgment burden.  Therefore, AMX is not entitled to summary judgment on this basis.

- 43 -

related to AMX's termination of the 1994 Agreement.

Section 14 of the 1994 Agreement states:

> No Liability for Termination or Nonrenewal.
>
> AMX shall not, by reason of the termination or nonrenewal of [Pilote's] distributorship, whether such termination or nonrenewal is with or without cause, be liable to [Pilote] for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales, or on account of expenditures, investments, losses or commitments in connection with the business or goodwill of [Pilote] or otherwise.

P. July 13, 2006 App. 11.

The court concludes from the plain meaning of § 14 that AMX cannot be held liable to Pilote for any damages for lost prospective profits or anticipated sales, or expenditures, investments, losses, or commitments in connection with Pilote's business or goodwill incurred by reason of the termination or nonrenewal of the 1994 Agreement. It is not entirely clear what Pilote considers to be the importance of its contention that the clause does not limit any damages incurred before termination. But if Pilote means that the clause is inapplicable to damages flowing from profits that were prospective, or sales that were anticipated, before the contract ended, the court disagrees. Section 14 clearly precludes a recovery of any such damages. And the damages need only have arisen "by reason of" the termination or nonrenewal of the agreement, not, if different, directly caused by the termination or nonrenewal. The court also concludes that Pilote

- 44 -

cannot recover contractual damages incurred after February 1, 2005. Pilote is not foreclosed under § 14 from recovering damages that are unrelated to AMX's termination or nonrenewal of Pilote's distributorship.

Accordingly, if is determined through trial that the 1994 Agreement controls the relationship between AMX and Pilote and that AMX breached the contract, as Pilote alleges, § 14 will be applied as set forth in this opinion to limit Pilote's recovery on its alternative claim for breach of the 1994 Agreement.

V

Pilote moves for summary judgment dismissing AMX's breach of fiduciary duty claim.[20]

A

AMX alleges that Pilote is liable for breach of fiduciary duty because it failed to use its best efforts to market, sell, and distribute AMX's products in France, to update its website with new AMX products, and to participate in organizing the September Road Show.  Pilote moves to dismiss this claim on the basis that the

---

[20]In its July 31, 2006 brief, AMX appears to argue that Texas law governs the entire relationship between AMX and Pilote and that Pilote therefore cannot sustain any cause of action based on French law.  AMX's arguments in support of Texas law, however, only address the contractual relationship between it and Pilote, ignoring Texas's choice-of-law rules as they apply to tort claims. Nonetheless, the court need not address whether the application of Texas choice-of-law rules mandates the dismissal of all of Pilote's French-law claims because, even assuming that French law controls, AMX is entitled to summary judgment dismissing the claims for the reasons explained below.

parties did not have a fiduciary relationship.  It argues that, under Texas law, to impose a fiduciary relationship in a business transaction, the fiduciary relationship must have existed prior to, and apart from, the agreement made the basis of the suit.  Pilote contends that AMX is relying on the exclusive distributorship agreement itself to establish the fiduciary relationship, not on evidence of a prior relationship, and that AMX's breach of fiduciary duty claim must fail because there is no evidence of a prior relationship apart from the agreement made the basis of the suit.

AMX responds that AMX and Pilote did have a relationship prior to and apart from the transactions made the basis of the suit, because the parties entered into an exclusive distributorship agreement from February 1, 1994 until February 1, 1995.  After this relationship, they continued to transact business for the next ten years.  AMX maintains that it had a fiduciary relationship with Pilote based on their long-standing dealings.  It also argues that Pilote owed AMX a fiduciary duty because it accepted AMX's trade secrets and confidential information.  And it posits that, in combination, the nature and length of their business relationship, and AMX's disclosure of trade secrets to Pilote, support the premise that Pilote owed a fiduciary duty to AMX.

B

> Texas law recognizes two types of fiduciary
> relationships: (1) the formal fiduciary
> relationship, which arises as a matter of law
> and includes relationships such as those
> between attorney and client, principal and
> agent, and partners; and (2) the informal
> fiduciary relationship, which may arise from a
> moral, social, domestic, or purely personal
> relationship of trust and confidence.

*Golden v. McNeal*, 78 S.W.3d 488, 493 (Tex. App. 2002, pet. denied)

(citing *R.R. Street & Co. v. Pilgrim Enters., Inc.*, 81 S.W.3d 276

(Tex. App. 2001), *rev'd on other grounds*, 166 S.W.3d 232, 255 (Tex.

2005)).   "Under Texas law, a supplier/distributor relationship is

not the type of formal relationship that automatically gives rise

to a fiduciary duty." *ARA Automotive Group v. Cent. Garage, Inc.*,

124 F.3d 720, 723 (5th Cir. 1997) (citing *Crim Truck & Tractor v.

Navistar Int'l*, 823 S.W.2d 591, 594 (Tex. 1992); *Adolph Coors Co.

v. Rodriguez*, 780 S.W.2d 477, 481 (Tex. App. 1989, writ denied)).

Thus to withstand summary judgment, AMX must adduce facts that

would permit a reasonable jury to find the existence of an informal

fiduciary relationship.

"An informal fiduciary duty may arise from a moral, social,

domestic or purely personal relationship of trust and confidence,

generally called a confidential relationship." *Associated Indem.

Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)

(citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).   To

demonstrate a relationship of "confidence and trust" that can

support the existence of a fiduciary relationship, the party must establish facts that would permit the jury to infer that the relationship "require[d] the fiduciary to 'put the interests of the beneficiary ahead of its own if the need ar[ose].'" *Imperial Premium Fin., Inc. v. Khoury*, 129 F.3d 347, 353 (5th Cir. 1997) (citing *ARA Auto. Group*, 124 F.3d at 723). "In order to give full force to contracts, [Texas courts] do not create such a relationship lightly." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). In fact, "since the Texas Supreme Court's decision in *Crim Truck*, few Texas cases have found fiduciary relationships outside of legal relationships that carry fiduciary duties as a matter of law [,] and none had found such a relationship in a transactional setting involving experienced managers[.]" *Khoury*, 129 F.3d at 353-54 (quotation marks omitted) (citing *ARA Auto. Group*, 124 F.3d at 723, 726).

An arm's-length business transaction will not alone support a finding that a fiduciary relationship exists because, as a rule, "a party to a contract is free to pursue its own interests, even if it results in a breach of that contract, without incurring tort liability." *Crim Truck*, 823 S.W.2d at 594 (citing *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981)); *see also ARA Automotive Group*, 124 F.3d at 726-27 (finding no fiduciary duty where "two sophisticated businesses entered into a number of contracts for mutual benefit, but the evidence does not demonstrate

- 48 -

that either party agreed to put the other's interests ahead of its own."). Further, "[t]o impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp.*, 964 S.W.2d at 288 (citing *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995)).

C

As evidence of a relationship "prior to and apart from" the one on which it bases its claim——i.e., the long-standing ten-year relationship——AMX relies on the 1994 Agreement, under which the parties had an exclusive distributorship agreement from February 1, 1994 to February 1, 1995. But this relationship would not permit a reasonable jury to find that AMX and Pilote had a special relationship of trust and confidence prior to and apart from the one that AMX says existed from February 1, 1995 to February 1, 2005. The 1994 Agreement was an arm's-length transaction entered into for the parties' mutual benefit. As such, the agreement is insufficient of itself to permit a reasonable jury to find that a special relationship of confidence and trust existed prior to the ten-year relationship on which AMX relies. *See Associated Indem. Corp.*, 964 S.W.2d at 288.

Nor can AMX rely on evidence of the ten-year relationship to establish the existence of a fiduciary duty. Even if the

- 49 -

distribution arrangement between AMX and Pilote continued for ten years after the expiration of the 1994 Agreement, AMX has not established that this ten-year relationship is anything more than a prolonged business relationship. The length of the relationship, without more, does not transform a business relationship into a fiduciary one. And even if AMX trusted Pilote in promoting its products abroad, it is well established that "mere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp.*, 959 S.W.2d at 177. Rather, to establish the existence of an informal fiduciary relationship, the record must show that one of the parties relied on the other "for moral, financial, or personal support or guidance." *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex. App. 2002, no pet.). AMX may have, in fact, "trusted" Pilote to act in its best interest in promoting AMX's products in France. But it has not adduced evidence from which a reasonable jury could find that this amounted to anything more than AMX's subjective trust. AMX has not produced proof that it relied on Pilote for guidance or that suggests that Pilote had a duty to put the interests of AMX above its own financial interests. A reasonable jury could only find that AMX and Pilote were operating under an arm's-length business transaction.

The fact that AMX provided Pilote with the type of confidential information involved here—e.g., a customer list—is

also insufficient to enable a reasonable jury to find that their arm's-length business dealings constituted a fiduciary relationship. Businesses frequently must exchange confidential information of this type so that they can do business with each other. Such information will often include confidential details about customers, marketing strategy, and pricing. But the mere sharing of this type of information in this context does not establish an informal fiduciary relationship. *See, e.g. Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 444 (Tex. App. 2002, pet. denied) (finding evidence that plaintiff shared confidential information with defendant was not evidence of informal fiduciary relationship). If it did, many otherwise arm's-length business relationships would be transformed into fiduciary relationships. Accordingly, even assuming that AMX subjectively trusted Pilote, its providing Pilote with the confidential information needed to promote and distribute AMX's products effectively in France is insufficient evidence to support the reasonable finding of an informal fiduciary relationship.

The court therefore grants Pilote's motion for summary judgment to the extent of dismissing AMX's breach of fiduciary duty claim.

VI

Pilote moves for summary judgment dismissing AMX's claim under Texas law for tortious interference with prospective relations.

A

AMX alleges that Pilote is liable under Texas law for tortious interference with prospective relations because Pilote's failure to participate in the Road Show——in which it would have marketed, sold, and distributed AMX's products——prevented AMX from entering into new business relationships with other dealers in France. Pilote moves for summary judgment on this claim. Citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001), it argues that AMX cannot prove that Pilote's conduct was independently tortious or unlawful, as Texas law requires. Pilote reasons that because there is no independent duty, apart from an alleged contractual provision, that would require Pilote to participate in organizing the Road Show, AMX cannot prove any conduct that could be independently tortious or unlawful.

AMX responds that Pilote owed AMX a fiduciary duty, and the breach of this fiduciary duty supplies the requisite independent tort sufficient to support the tortious interference claim. It alleges that Pilote's failure to respond to AMX's attempts to contact Pilote to discuss the Road Show is a failure to fulfill fiduciary obligations, and it argues that Pilote repeatedly

breached fiduciary duties owed to AMX regarding the marketing, selling, and distributing of AMX's products in France. Furthermore, AMX maintains that Pilote has failed to return any of AMX's materials and alleges that Pilote may be using AMX's confidential information and trade secrets in competition against AMX.

B

"[T]o establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal-Mart Stores*, 52 S.W.3d at 713.  For conduct to be "independently tortious," it must be "conduct that would violate some other recognized tort duty." *Id.*  AMX maintains that Pilote engaged in independently tortious conduct by breaching the fiduciary duties it owed to AMX and by using AMX's confidential information and trade secrets in competition against AMX.  AMX has not produced evidence, however, that would permit a reasonable jury to find that Pilote engaged in either of these independent torts.

The court has already dismissed AMX's claim for breach of fiduciary duty, finding that AMX cannot establish that a fiduciary relationship existed between it and Pilote.  *See supra* § V(C).  Although AMX supports its tortious interference claim with allegations and evidence that Pilote breached alleged fiduciary duties, AMX adduces no evidence that would support a finding that

the relationship between AMX and Pilote was a fiduciary relationship.  And without such a relationship, there can be no breach of a fiduciary duty.  Thus the allegation that Pilote breached a fiduciary duty it owed to AMX is insufficient to provide the basis for AMX's tortious interference claim.

Likewise, the assertion that "Pilote may be using AMX's confidential information and trade secrets in competition against AMX"——to the extent this allegation is separate from AMX's allegation that Pilote breached the fiduciary duty it owed to AMX—— is insufficient to overcome Pilote's motion.  AMX has adduced no evidence that Pilote is using AMX's confidential information and trade secrets in competition against it, and AMX's mere assertion that this is true is not competent summary judgment evidence.

Accordingly, the court grants summary judgment dismissing AMX's Texas-law claim for tortious interference with prospective business relations.

VII

Pilote seeks summary judgment dismissing AMX's declaratory judgment action on the basis that each claim is redundant of another pending cause of action and is moot.

A

AMX requests a declaratory judgment that (1) the 1994 Agreement was terminated by Pilote's failure to use its best efforts to market, sell, and distribute AMX's products in France;

(2) Pilote must return AMX's product literature and immediately cease distributing any of AMX's sales or promotional materials; (3) the 1994 Agreement permitted AMX to have a regional sales support manager for Europe, including the Territory; (4) the 1994 Agreement permitted AMX to conduct the September Road Show; and (5) AMX is not liable to Pilote by reason of the termination or nonrenewal of Pilote's distributorship.   Pilote argues that each claim is redundant of another pending claim and/or is moot.   It maintains that AMX's requested declarations revolve around the interpretation of the 1994 Agreement and that each asks about a specific provision of the 1994 Agreement or about whether the 1994 Agreement permits AMX to take some action.   Pilote maintains that the court will address these questions in dealing with the other causes of action. Pilote also argues that because the 1994 Agreement no longer controls, all declarations regarding the contract are moot.

AMX concedes in response that its first, third, and fourth requests can be resolved by resolution of its breach of contract claim.   Accordingly, the court grants Pilote's motion for summary judgment insofar as it seeks dismissal of the first, third, and fourth grounds of AMX's declaratory judgment action.

AMX contends that neither its second (that Pilote must return AMX's product literature and immediately cease distributing any of AMX's sales or promotional materials) nor fifth (that AMX is not liable to Pilote by reason of the termination or nonrenewal of

Pilote's distributorship) ground for a declaratory judgment is moot or redundant. AMX asserts that neither concerns whether the parties entered into an enforceable contract, or whether Pilote breached the contract.

B

The Declaratory Judgment Act, 28 U.S.C. § 2201, states: "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Federal courts have broad discretion to grant or refuse declaratory judgment. *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).

In AMX's second request for declaratory relief, it seeks the following:

> Within ten days after the final judgment in this case, Pilote shall return to AMX all catalogs, price lists, advertising and other printed materials relating to the products, in its possession. Immediately upon final judgment in this case, Pilote shall cease distributing any sales or promotional materials on the AMX Products including any materials prepared by or at the direction of Pilote.

Pet. ¶ 22. This request is nearly identical to § 13(b) of the 1994 Agreement.

> The DJA remedy was designed as a means to
> facilitate early and effective adjudication of
> disputes at a time when a controversy, though
> actual, may still be incipient, but before it
> expands into larger conflict.  The action
> generally commences at the instance of a party
> facing potential liability to another who may
> have an accrued claim at that time but has not
> yet commenced coercive litigation to pursue
> relief.  By enabling the parties to narrow the
> issues and differences and expedite resolution
> of their conflict, the DJA procedure helps to
> minimize the prolongation of disputes, reduce
> the risk of loss and avoid the unnecessary
> accumulation of damages.

*Dow Jones & Co. v. Harrods, Ltd.*, 237 F.Supp.2d 394, 405 (S.D.N.Y. 2002).  AMX's second request does not seek early and effective adjudication of an incipient controversy, before it expands into larger conflict, or seek to expedite resolution of that conflict. AMX seeks remedial relief arising from the termination of the 1994 Agreement.  The court declines in its discretion to entertain a declaratory judgment request that seeks a remedy arising from a contractual relationship that has already been terminated and that has ripened into litigation.[21]

As explained in AMX's response, its fifth request is based on the limitation-of-liability clause, § 14 of the 1994 Agreement, which the court has addressed *supra* at § IV(E).  *See* P. July 11, 2006 Br. 33-34.  To the extent the court's ruling has not resolved this question, the court declines, in its discretion, to exercise

---

[21]The court does not suggest that this would invariably be the court's approach, but it is the one called for under the facts of this particular case.

its declaratory judgment jurisdiction for the same reasons it has declined to entertain AMX's second request.   The contractual relationship between AMX and Pilote has already been terminated and ripened into litigation, and, insofar as AMX seeks to use the limitation-of-liability clause to limit the damages Pilote can recover on its alternative breach of contract claim, it can do so in the context of this litigation.

Accordingly, the court dismisses AMX's claim for declaratory relief.

VIII

The court now turns to AMX's motion for summary judgment addressed to Pilote's counterclaims.   The first counterclaim as to which AMX seeks relief is for unfair competition under Texas law.

A

Pilote alleges that AMX's use of Pilote's trademark in and affecting commerce is unfair competition and a false designation of origin that is likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of AMX with Pilote.   AMX maintains that it is entitled to summary judgment because Pilote cannot recover on its unfair competition claim without some finding of an independent substantive tort or other illegal conduct.   Citing Texas law, AMX contends that unfair competition is not a stand-alone cause of action, and that, although Pilote alleges claims for trademark infringement, common

- 58 -

law misappropriation, and trade secret misappropriation, and other claims under French law, since it cannot establish the essential elements of any of the claims, it cannot recover for unfair competition.

Pilote responds that recovery is available for unfair competition where proper notice of the claim is given, and that it has adequately alleged and given notice of a claim based on palming off.

B

Under Texas law, "unfair competition" is "a general rubric under which fall all statutory and non-statutory causes of action arising out of dishonesty in industrial or commercial matters." *Keane v. Fox Television Stations, Inc.*, 297 F.Supp.2d 921, 938 (S.D. Tex. 2004) (citing *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). To prevail on a claim of unfair competition, "the plaintiff must show that the defendant committed an illegal act that interfered with the plaintiff's ability to conduct its business; the illegal act need not necessarily violate criminal law, but must at least be an independent tort." *Id.* (citing *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000)). "Without some finding of an independent substantive tort or other illegal conduct . . . liability cannot be premised on the tort of 'unfair competition.'" *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904-05 (Tex. App. 1989,

writ denied).

Pilote identifies as the basis for its unfair competition claim the assertion that AMX used Pilote's trademark unfairly, as a false designation of origin that was likely to cause confusion, mistake, or deception as to affiliation, connection, or association with AMX as to origin, sponsorship, or approval, i.e., palming off. As discussed *infra* at § IX, AMX is entitled to summary judgment dismissing each of Pilote's claims based on AMX's improper use of Pilote's trademark.

Accordingly, because Pilote cannot show that AMX committed the independent tort on which it relies, AMX is entitled to summary judgment dismissing Pilote's unfair competition counterclaim.

IX

AMX moves for summary judgment dismissing Pilote's counterclaim for trademark infringement.

A

Pilote asserts a counterclaim for trademark infringement, alleging that the intentional, unauthorized use of its trademark is likely to cause confusion between AMX's goods and goods associated with Pilote and that such use palms off AMX's goods as those of Pilote, thereby injuring Pilote's reputation and goodwill and unjustly diverting from Pilote to AMX the benefits arising from the use of the trademark. AMX argues that it is entitled to summary judgment because, aside from Pilote's bare allegations, it cannot

prove that any alleged use of its trademark was likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of AMX with Pilote, or as to the origin, sponsorship, or approval of AMX's goods.

Pilote responds that likelihood of confusion is a question of fact. It points to evidence that AMX used Pilote's name and trademark after February 1, 2005, without Pilote's permission. Pilote also cites AMX's Pocket Guide and website as evidence of AMX's continued use of Pilote's name in association with AMX products, asserting that such use necessarily confused the French market as to the supplier for whom Pilote was the distributor. Pilote avers that this affected its marketing of Crestron products in the French market after February 1, 2005. It contends that the summary judgment record contains sufficient evidence to enable a jury to find that there was a likelihood of confusion.

B

The elements of a common law trademark infringement action under Texas law are no different than those under federal trademark law. *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App. 1999, no pet.) (citing *Waples-Platter Cos. v. Gen. Foods Corp.*, 439 F. Supp. 551, 583 (N.D. Tex. 1977) (Mahon, J.)). To establish a claim for trademark infringement, the plaintiff must demonstrate: (1) the name it seeks to protect is eligible for protection; (2) it is the senior user of the name; (3)

there is a likelihood of confusion between its mark and that of the other user; and (4) the likelihood of confusion will cause irreparable injury for which there is no adequate legal remedy. *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.* 53 S.W.3d 799, 806 (Tex. App. 2001, pet. denied) (citing *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App. 1992, no writ)). The only element AMX challenges is the third element——likelihood of confusion——which is a question of fact. *See id.* (citing *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 537 (5th Cir. 1998)).

In determining likelihood of confusion, the trier of fact may consider a number of factors, including

> (1) the type or strength of the mark; (2) the degree of similarity between the plaintiff's and defendant's mark; (3) the similarity between plaintiff's and defendant's goods or services; (4) the identity of plaintiff's and defendant's customers; (5) the similarity of plaintiff's and defendant's advertising; (6) the defendant's intent; and (7) the existence of actual confusion.

*Id.* at 809 (citing *Pebble Beach Co.*, 155 F.3d at 543). "This list is not exhaustive, and it is not necessary for the plaintiff to show that all of the factors are present." *Id.*

Here, however, Pilote has failed to present evidence that would permit a reasonable jury to find likelihood of confusion. It has cited proof that would support a finding that AMX used Pilote's trademark without authorization. But assuming *arguendo* that this

evidence is admissible, it is insufficient to support such a finding.  The only proof that Pilote has adduced that even addresses likelihood of confusion is its statement that "[s]uch use of Pilote's name in association with AMX products could not help but confuse the French market." D. Aug. 28, 2006 Br. 28.  But this assertion——which represents essentially the subjective opinion of Hulsmeyer, Pilote's General Manager——is alone insufficient to present a genuine issue of material fact.

Because Pilote has not adduced evidence that would permit a reasonable jury to find that AMX's use of Pilote's trademark is likely to cause confusion, the court dismisses Pilote's trademark infringement counterclaim.

X

AMX moves for summary judgment on Pilote's French-law unfair competition counterclaim.

A

Pilote alleges that AMX is liable for unfair competition and passing off, in violation of Articles 1382 and 1383 of the French Civil Code.  It avers that, among other things, AMX improperly contacted Pilote's employees and improperly used Pilote's name and/or trademark without permission.

AMX maintains that this claim must be dismissed because Pilote cannot establish that AMX improperly used Pilote's name and/or trademark without permission or establish that Pilote suffered any

harm or damages.   In response, Pilote relies on the same evidence that it uses to support its trademark infringement counterclaim based on AMX's use of Pilote's name and trademark: Hulsmeyer's testimony that AMX used Pilote's name and trademark without permission, and the evidence of AMX's Pocket Guide and website.   It maintains that dealers in the French market were confused as to which products Pilote was actually endorsing and selling in France, causing lost sales because of confusion in the French market.

B

Under the French Civil Code, to recover for an intentional or unintentional tort, the plaintiff must have suffered damages. Article 1382, on which Pilote bases its counterclaim, provides: "Any act whatever of man, which causes damage to another, obliges the one by whose fault it occurred, to compensate it."  P. July 31, 2006 FLA App. 6.  Article 1383 states: "Everyone is liable for the damage he causes not only by his intentional act, but also by his negligent conduct or by his imprudence."  *Id.*   Under these Code provisions, Pilote cannot recover on its claim that AMX improperly contacted Pilote's employees and used its name and trademark unless it can show that it has suffered damages from AMX's actions. Pilote alleges that it has lost sales because of the confusion in the French market, but it has not presented summary judgment evidence from which a reasonable jury could find in its favor. Hulsmeyer's testimony is insufficient of itself to permit such a

finding and thus to raise a genuine fact question regarding whether the French market was confused by AMX's use of Pilote's trademarks and, as a result, Pilote lost sales.

The court therefore grants summary judgment dismissing this counterclaim.

XI

AMX seeks summary judgment dismissing Pilote's counterclaims for common law misappropriation and trade secret misappropriation.[22]

A

Pilote alleges that AMX is liable for common law misappropriation because AMX used Pilote's trade secrets in competition with Pilote, thereby gaining a special advantage because AMX was not burdened with the expense that Pilote incurred.[23]  It also asserts that AMX misappropriated Pilote's trade

---

[22]The court addresses these claims together because its reason for dismissing both is the same.

[23]Under Texas Common law, to establish a claim for misappropriation, the plaintiff must establish

> (i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff.

*U.S. Sporting Prods., Inc. v. Johnny Steward Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App. 1993, writ denied) (citing *Synercom Tech., Inc. v. Univ. Computing*, 474 F. Supp. 37, 39 (N.D. Tex.

secrets by acquiring them through improper means and using them for its own commercial benefit without Pilote's authorization, knowing that the trade secrets had been obtained through improper means.[24]

AMX contends that it is entitled to summary judgment on Pilote's common law misappropriation claim, arguing that Pilote cannot demonstrate that AMX gained a special advantage by misappropriating Pilote's trade secrets, that Pilote is unable to show how AMX used the trade secrets to compete with Pilote, and that Pilote cannot prove what, if any, harm it endured due to AMX's alleged trademark infringement.  It also posits that Pilote cannot establish its trade secret misappropriation claim because it cannot establish the existence of a trade secret and cannot establish that it has suffered any injury as a result of any alleged trade secret misappropriation.  In response, Pilote avers that it developed a customer list of dealers in France that showed who purchased AMX products, and in what amounts, and took over ten years to develop. It argues that its customer list has significant value to AMX and other traditional competitors in the French market because of the time and money it required to develop.  It maintains that it kept

---

1979) (Higginbotham, J.)).

    [24]Under Texas law, a plaintiff can recover for misappropriation of a trade secret by establishing "(1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App. 2004, pet. denied) (citing *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 476 (Tex. App. 2001, pet denied)).

the customer list confidential, and only permitted AMX to meet some of its dealers on AMX's trip to France because it believed doing so was in furtherance of their business relationship, not for AMX to acquire Pilote's customer list.   Pilote alleges that AMX nevertheless used the customer list to contact Pilote's dealers and to sell at least $48,194.74 of products to TVSAT2 Design, Pilote's dealer in France.  Pilote maintains that it suffered injury when it lost over $48,000 in sales.

AMX argues in reply that the evidence on which Pilote relies of sales to TVSAT2 Design were made by AMX UK, and Pilote has failed to adduce evidence that AMX UK is the same entity as AMX. It therefore argues that Pilote has not established that *AMX* obtained profits or other economic benefits based on the use of Pilote's consumer lists, and therefore Pilote's common law misappropriation and trade secret misappropriation counterclaims must be dismissed.

B

"Texas law presumes that two separate corporations are distinct entities." *Carlson Mfg., Inc. v. Smith*, 179 S.W.3d 688, 693 (Tex. App. 2005, no pet.) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002)).   Accordingly, unless Pilote can establish a basis for a reasonable jury to treat AMX and AMX UK as the same entity, the actions of AMX UK cannot be attributed to AMX.

- 67 -

Under the "single business enterprise" theory, "when corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for debts incurred in pursuit of that business purpose." *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App. 1986, writ ref'd n.r.e.); *see also Allright Tex., Inc. v. Simons*, 501 S.W.2d 145, 150 (Tex. Civ. App. 1973, writ ref'd n.r.e.); *Murphy Bros. Chevrolet Co. v. E. Oakland Auto Auction*, 437 S.W.2d 272, 275-76 (Tex. Civ. App. 1969, writ ref'd n.r.e.). Courts use several factors to determine whether the constituent corporations have not been maintained as separate entities, including, but not limited to, the following: "common employees; common offices; centralized accounting; payment of wages by one corporation to another corporation's employees; common business name; services rendered by the employees of one corporation on behalf of another corporation; undocumented transfers of funds between corporations; and unclear allocation of profits and losses between corporations." *Paramount Petroleum Corp.*, 712 S.W.2d at 536 (citing *Allright*, 501 S.W.2d at 150; *Murphy Bros. Chevrolet Co.*, 437 S.W.2d at 275-76.). "The doctrine looks to see if principles of equity support a holding that the two entities should be treated as one for purposes of liability for their acts." *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 120 (Tex. App. 2001, pet. denied). "In order to grant

- 68 -

relief under [the single business enterprise theory], the fact finder must determine whether the relationship between the parties satisfies the tests for imposing liability under the single business enterprise . . . exception[ ]." *In re Tex. Am. Exp., Inc*., 190 S.W.3d 720, 726 (Tex. App. 2005, orig. proceeding) (citing *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 931 (Tex. App. 1993, no writ); *Gensco, Inc. v. Canco Equip*., Inc., 737 S.W.2d 345, 347 (Tex. App 1987, no writ)).

Although the single business enterprise theory is an equitable theory of liability, the court will assume that the doctrine also applies when a plaintiff is attempting to prove that the defendant misappropriated a trade secret and enabled a related corporation to use the trade secret to the plaintiff's detriment.  In its first amended counterclaims, Pilote alleges that AMX integrated its resources with AMX UK and AMX Belgium, forming a single business enterprise.  But Pilote has adduced no evidence from which a reasonable jury could find that AMX and AMX UK formed a single business enterprise within the meaning of Texas law.  Pilote's evidence that AMX UK sold $48,194.74 worth of products to a dealer on Pilote's customer list is insufficient to establish that AMX benefited from the use of the customer list or that Pilote suffered harm as a result.  Accordingly, absent the necessary evidence to prevail on this claim, Pilote cannot recover for common law or trade secret misappropriation.

XII

AMX seeks summary judgment dismissing Pilote's counterclaim for restitution/unjust enrichment under French law, contending that it cannot establish that AMX is obtaining profits or other economic benefits based on the use of Pilote's customer information that is not covered by contract. Pilote responds by pointing to the $48,000 in products AMX UK sold to TVSAT2 Design during the time Pilote was AMX's exclusive distributor in France. For the reasons explained *supra* at § XI(B), evidence of sales by AMX UK is insufficient to permit a reasonable jury to find for Pilote, because these sales do not establish a claim against AMX. Pilote has not adduced evidence that would permit a reasonable jury to find that AMX has obtained profits or economic benefit from the use of Pilote's consumer list. AMX is therefore entitled to summary judgment dismissing Pilote's counterclaim for restitution/unjust enrichment under French law.

XIII

AMX moves for summary judgment dismissing Pilote's counterclaim under French law for obtaining an advantage unrelated to a commercial service.

- 70 -

A

Pilote asserts a counterclaim under Article L. 442-6 2° of the French Commercial Code,[25] alleging that AMX obtained or sought to obtain from Pilote advantages unrelated to commercial services effectively rendered or that were manifestly disproportionate to the value of the service rendered.  AMX moves for summary judgment on the ground that Pilote cannot establish that AMX obtained or sought to obtain from Pilote advantages unrelated to the commercial services effectively rendered or that were manifestly disproportionate to the value of the service rendered.  It also maintains that Pilote cannot establish that it has suffered any damages as a result of AMX's conduct.

---

[25]Article L. 442-6 of the French Commercial Code provides:

> I.   The following acts committed by any producer, trader, manufacturer or person listed in the trade register render the perpetrator liable and entail the obligation to redress the prejudice caused:
> . . .
> 2. a) Obtaining, or seeking to obtain, from a trading partner any advantage unrelated to a commercial service effectively rendered or which is manifestly disproportionate to the value of the service rendered.  Such an advantage might consist, inter alia, of participation in the financing of promotional activities, an acquisition or an investment which is not justified by a common interest and does not offer proportionate compensation, particularly in the context of shop renovation or access to outlets or central listing or purchasing facilities . . . .

P. July 31, 2006 FLA App. 9.

Pilote responds that, under the French Commercial Code, AMX can be liable if it sought to obtain from Pilote any advantage manifestly disproportionate to the value of the service it rendered. It maintains that AMX violated this law by seeking Pilote's participation and investment of manpower and resources for the Road Show. Pilote contends that an email sent by an AMX employee is proof that the Road Show was for AMX's benefit, not Pilote's. It argues that because AMX sought to use Pilote's participation in the Road Show to gain a benefit for itself, AMX has violated Article L. 442-6 2°.

B

Although Pilote has raised a genuine issue of material fact regarding whether AMX violated Article L. 442-6 2°, it has not adduced evidence that would permit a reasonable jury to find that Pilote suffered damages as a result. Nor does it argue that it can recover under Article L. 442-6 2° without adducing proof that it suffered harm as a result of AMX's actions.[26] Pilote did not participate in the Road Show and has not introduced proof that it expended financial resources or manpower on it.

Accordingly, because Pilote cannot establish that it suffered

_____

[26]AMX contended in its summary judgment brief that Pilote could not recover because it was unable to prove that it suffered damages. In response, Pilote has not argued that it can recover on its French-law claim in the absence of damages. Accordingly, the court assumes that, under French law, damages would be a necessary component of an Article L. 442-6 2° claim.

damages as a result of this violation, AMX is entitled to summary judgment dismissing this counterclaim.

### XIV

AMX maintains that Pilote's counterclaim for French statutory trade secret misappropriation fails because Pilote cannot establish that AMX revealed or attempted to reveal Pilote's trade secrets without authority.  Pilote agrees that AMX is correct.  D. Aug. 28, 2006 Br. 1, 42.  Accordingly, the court grants AMX's motion for summary judgment dismissing this counterclaim.

### XV

AMX moves for summary judgment dismissing Pilote's counterclaim under French law for sudden breaking off an established business relationship.

### A

Pilote asserts a counterclaim for sudden breaking off an established business relationship, in violation of Article 442-6 5° of the French Commercial Code and 1134 of the French Civil Code. It avers that it is entitled to this relief based on AMX's failure to provide prior notice commensurate with the duration of the business relationship and consistent with the minimum notice period determined with the multi-sector agreements in line with standard French commercial practices.

AMX moves for summary judgment dismissing this claim.  It recognizes that, under French statutory law, a manufacturer may be

liable for the sudden breaking off of an established business relationship if the manufacturer does not provide sufficient prior written notice commensurate with the duration of the business relationship. But it contends that under French law the judge is the arbiter of what length of time is reasonable, he may consider the distributor's economic dependence on the manufacturer, and the eight months' notice of termination that AMX provided Pilote was sufficient in the context of their ten-year relationship. It further points out that within a month of the February 2005 termination, Pilote began marketing and selling the products of AMX's competitor, Crestron, and that this evidences the fact that Pilote's ability to reorganize its business activity was not hindered.

Pilote relies in response on the testimony of its French-law expert, Philippe L. Migeot ("Migeot"), who opines that the minimum notice period is determined by standard French commercial practices. According to Migeot, notice is controlled by Art. L. 442-6 1 5°; the most frequent delay between the first contact with the prospect and the final installation of AMX equipment at the client is from six to eighteen months; the length of time needed to consummate a sale with a client after initial contact is probative; and the issue of notice is to be determined at trial commensurate with the duration of the business relationship and consistent with the minimum notice period determined by the multi-sector agreements

- 74 -

in line with standard commercial practices.  Migeot opines that AMX failed to provide this notice.  Pilote therefore contends there is sufficient evidence for a jury to find that AMX failed to provide Pilote sufficient notice under French law.

AMX replies that, in determining whether notice of nonrenewal was sufficient, French courts look to the distributor's economic dependence on the manufacturer and whether the distributor was allowed sufficient time to reorganize its business activity.  It points to evidence that AMX provided Pilote more than eight months' notice of nonrenewal; Pilote became a distributor for Crestron (AMX's direct competitor) the very same month that the distributorship relationship with AMX ended; and AMX only accounted for 28 to 36% of Pilote's sales.  AMX maintains that Migeot's testimony supports AMX's position, because he states that the delay between the first contact with a prospect and the final installation of AMX equipment is from six to eighteen months, and AMX's notice falls within this time frame.  It argues that the more accurate measure is the amount of time between the initial contact and the time when the order was placed, and that this is undoubtedly shorter than the period that Migeot predicted.  AMX posits that the court must examine AMX's notice in the context of Pilote's economic dependence on AMX, its ability to reorganize, and the length of time between initial contact and consummation and that, based on the undisputed facts, AMX has established that its

notice was sufficient as a matter of French law.

B

The court holds that AMX's notice to Pilote was sufficient under French law.  In dealing with the question whether notice was sufficient in breaking off an established relationship, the Appeal Court Lyon stated, "[i]t is the judge's duty to ascertain the legality of the notice period and whether or not it allows the operator enough time to seek and find another business activity." P. July 31, 2006 FLA App. 51.  It further explained, "[i]n order to investigate what constitutes a reasonable or sufficient notice period, one has to dwell on the circumstances surrounding the facts pertaining to the broken commercial relationship."  *Id.*[27]

The summary judgment record establishes that AMX provided Pilote more than eight months' notice of nonrenewal.  Pilote does not dispute the fact that it became a distributor for AMX's direct competitor, Crestron, the same month that Pilote's relationship with AMX ended.  And it is uncontested that AMX only accounted for

_____

[27]The court recognizes that, as a civil law country, the decision of a French court—here the Appeal Court Lyon—has no binding effect.  *See, e.g. Fin. One Public Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 343 (2d Cir. 2005)(explaining that in civil law jurisdictions, "judicial decisions in general are of only persuasive and not binding authority); *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 261 (5th Cir. 2003) (recognizing that in civil law jurisdictions, judicial decisions are secondary law source).  The court cites the Appeal Court Lyon's explanation and reasoning, not as binding precedent, but as a helpful explanation of, and persuasive authority concerning, the appropriate role for the court in deciding Pilote's sudden breaking off claim.

28 to 36% of Pilote's sales.  Based on these facts, the court holds
as a matter of law that the eighth months' notice AMX gave Pilote
was sufficient.  It therefore grants summary judgment dismissing
counterclaim under French law for sudden breaking off.

XVI

The court now considers the ground of AMX's motion in which it
seeks dismissal of Pilote's counterclaim under French law for
breach of exclusivity by interference with a third party contract.

A

Pilote asserts a counterclaim under Article L. 442-6 6° of the
French Commercial Code for breach of exclusivity by interference
with a third party contract.  It alleges that AMX had direct and/or
indirect involvement in the French market, in violation of the
prohibition on reselling outside the network imposed on Pilote by
its exclusive distribution agreement with AMX.  AMX argues that it
is entitled to summary judgment dismissing this claim because
Pilote cannot establish that AMX had direct and/or indirect
involvement in the French market or that Pilote suffered any damage
as a result of AMX's conduct.

Pilote responds that AMX is not entitled to summary judgment;
instead, there is sufficient evidence to grant summary judgment in
Pilote's favor as to liability.  Pilote maintains that there is no
dispute that the parties' relationship was governed by an
exclusivity provision; the exclusivity period did not end until

February 1, 2005; and TVSAT2 Design placed orders with AMX UK before February 1, 2005. It therefore maintains that the jury need only decide how much Pilote was damaged.

Pilote also contends that AMX UK reports directly to Michael Olinger ("Olinger"), and that AMX makes no distinctions among AMX, AMX UK, and AMX Belgium. In support of this assertion, Pilote cites statements that refer to a "seamless state of affairs" among AMX, AMX UK, and AMX Belgium. D. Aug. 28, 2006 Br. 46.

AMX replies, as it has in opposition to other counterclaims, that evidence of sales by AMX UK to TVSAT2 Design does not establish that AMX sold products outside Pilote's distribution network. It argues that because Pilote has not established as a matter of law that AMX and AMX UK operated as a single business entity, the references to sales by AMX UK cannot serve as evidence of AMX's business activities.

B

Pilote has not introduced summary judgment evidence that would permit a reasonable jury to find in its favor for breach of exclusivity by interference with a third party contract. According to the summary judgment evidence, AMX and AMX UK are separate legal entities. Aside from the references in Olinger's deposition that suggest that the three AMX entities' sales forces work together, Pilote has not provided evidence that would enable a reasonable jury to find that AMX and AMX UK should be treated as the same

entity.  Pilote sues only AMX and has not adduced any evidence from which a reasonable jury could find that AMX participated in the French market.  The sales by AMX UK to TVSAT2 Design would not permit a reasonable jury to find in Pilote's favor on this counterclaim.  Accordingly, it is dismissed.

XVII

AMX moves for summary judgment dismissing Pilote's counterclaim under French law for business disparagement.

A

Pilote sues AMX for business disparagement under Article L. 443-2° of the French Commercial Code and Articles 1382 and 1383 of the French Civil Code.  It alleges that AMX broadcast false or slanderous information and/or made offers intended to disrupt prices, or threw on the market offers at the prices requested by sellers and/or used other fraudulent means to artificially increase or reduce the price of goods or services.  Pilote also alleges that AMX published disparaging words about Pilote, thus harming Pilote's business reputation, and that these words were false and made with malice and without privilege.

AMX moves for summary judgment on the ground that Pilote cannot establish that AMX broadcast false or slanderous information, made offers intended to disrupt prices, threw on the market offers at the prices requested by sellers, or used other fraudulent means to artificially increase or reduce the price of

goods or services.  It maintains that Pilote's only evidence of business disparagement is a statement in Hulsmeyer's deposition that it was brought to her attention that Catherine Berriat ("Berriat"), an AMX employee, "was not too fond about Pilote Films," P. July 31, 2006 Br. 29, and it argues that this is insufficient to establish a business disparagement counterclaim.

In response, Pilote requests a continuance under Fed. R. Civ. P. 56(f), arguing that Berriat is the only person who knows to whom she corresponded or spoke, and that Berriat will not be deposed until after Pilote's summary judgment response is due.

AMX replies that Pilote's only allegation regarding its claim for business disparagement is that an AMX employee was "not too fond" of Pilote, and that this is insufficient to support a business disparagement counterclaim.  It points to the absence of any other defamatory statements outside the Pilote representative's inadmissible hearsay statement, and argues that because this hearsay statement was never published and Pilote has not offered any evidence of harm, summary judgment should be granted on this counterclaim.[28]

---

[28]AMX also maintains that, due to her health, Berriat was unable to travel abroad for the initially scheduled deposition, but that AMX's counsel offered her for deposition in France, Belgium, or London; that Pilote continually demanded that Berriat be produced for deposition in Dallas, despite being told on numerous occasions that her health prevented transatlantic travel; and that Pilote was able to depose Berriat before its summary judgment response was due.  The court need not consider these contentions in concluding that Rule 56(f) relief should be denied.

B

Rule 56(f) provides that

> [s]hould it appear from the affidavits of a
> party opposing the motion [for summary
> judgment] that the party cannot for reasons
> stated present by affidavit facts essential to
> justify the party's opposition, the court may
> . . . order a continuance to permit affidavits
> to be obtained or depositions to be taken or
> discovery to be had or may make such other
> order as is just.

"The Rule is an essential ingredient of the federal summary judgment scheme and provides a mechanism for dealing with the problem of premature summary judgment motions." *Parakkavetty v. Indus Int'l, Inc.*, 2004 WL 354317, at *1 (N.D. Tex. Feb. 12, 2004) (Fitzwater, J.) (citing *Owens v. Estate of Erwin*, 968 F.Supp. 320, 322 (N.D. Tex. 1997) (Fitzwater, J.)). "The continuance authorized by Rule 56(f) is a safe harbor built into the rules so that summary judgment is not granted prematurely." *Id.* (citing *Union City Barge Line Inc. v. Union Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987)). "To comply with the Rule, the party opposing summary judgment must file the specified non-evidentiary affidavit, explaining why he cannot oppose the summary judgment motion on the merits." *Id.* "The party may not rely on vague assertions that additional discovery will produce needed, but unspecified, facts, but must instead identify a genuine issue of material fact that justifies the continuance pending further discovery. *Id.* (citations omitted). "A party seeking a continuance of a motion

for summary judgment must demonstrate why he needs additional discovery and how the additional discovery will create a genuine issue of material fact." *Id.* (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993)).

Pilote has failed to show how additional discovery will create a genuine issue of material fact. It requests Rule 56(f) relief to develop evidence concerning AMX's improper contacts and communications with dealers and customers in France. It maintains that Douglas Davis, the person with the most direct knowledge of Berriat's activities in France, had no actual knowledge of to whom she talked or what she said in France. But while this evidence could establish Berriat's (and thus AMX's) publication of actionable statements or conduct, Pilote fails to show that the discovery, if obtained, would enlarge on the single comment attributed to Berriat. The statement that Hulsmeyer attributed to Berriat——that "Berriat was not too fond about Pilote Films"——is insufficient as a matter of law to establish the claim for business disparagement regardless where it was published. Accordingly, Pilote is not entitled to Rule 56(f) relief to develop evidence of publication, because the statement in question, even if published, cannot constitute business disparagement.

The court therefore denies Pilote's request for a continuance under Rule 56(f), and it grants AMX's motion dismissing Pilote's French-law business disparagement counterclaim.

- 82 -

## XVIII

Pilote has asserted counterclaims for conversion, tortious interference with an existing contractual and/or business relationship, and business disparagement under Texas law. Although AMX states in its motion that it is seeking to dismiss all of Pilote's claims asserted in its first amended counterclaims, it has not pointed to the absence of evidence to support these three. Because AMX has not met its initial summary judgment burden, the court denies AMX's motion insofar as it seeks summary judgment dismissing Pilote's Texas-law claims for conversion, tortious interference with an existing contractual and/or business relationship, and business disparagement.

## XIX

In sum, the court dismisses AMX's declaratory judgment, breach of fiduciary duty, and tortious interference with prospective relations claims. Although AMX cannot establish that the 1994 Agreement was extended, it has presented fact issues on the doctrines of quasi-estoppel and judicial estoppel. The court therefore denies Pilote's motion for summary judgment on AMX's breach of contract claim. At trial, AMX will have the burden of establishing that quasi-estoppel or judicial estoppel prevents Pilote from denying that the 1994 Agreement governs the contractual relationship between AMX and Pilote. If it does not meet this burden, its breach of contract claim will likewise fail.

The court dismisses the following counterclaims asserted by Pilote: breach of implied contract (i.e., the French Agreement), French-law sudden breaking off an established business relationship, unfair competition, unfair competition under the French code, French-law obtaining an advantage unrelated to a commercial service, trademark infringement, French-law restitution/unjust enrichment, common law misappropriation, French-law statutory misappropriation of trade secrets, trade secret misappropriation under Texas law, French-law breach of exclusivity by interference with third party contract, and French-law business disparagement. All of Pilote's claims brought under French law are dismissed. Because AMX did not meet its initial summary judgment burden of pointing to the absence of evidence in support of Pilote's Texas-law conversion, tortious interference with an existing contractual and/or business relationship, and business disparagement claims, these causes of action remain for trial.

Pilote has also asserted an alternative claim for breach of the 1994 Agreement. If AMX is successful in establishing at trial that one of the doctrines of estoppel applies, thus preventing Pilote from taking the position that the 1994 Agreement did *not* control the relationship between Pilote and AMX, Pilote will also be permitted to prove its alternative breach of contract claim.[29]

---

[29]Essentially, at that point, AMX and Pilote will both have breach of contract claims against each other based on the 1994 Agreement.

- 84 -

If AMX does not prevail on one of its estoppel theories, however, it is questionable whether Pilote can succeed on its alternative claim, because the court has concluded that the 1994 Agreement expired by its own terms. And any recovery that Pilote could obtain under the 1994 Agreement would of course be limited by the limitation-of-liability clause in the 1994 Agreement. *See supra* § IV(E).

*     *     *

Pilote's May 31, 2006 motion for summary judgment is granted in part and denied in part. AMX's July 31, 2006 motion for summary judgment is granted in part and denied in part. AMX's July 31, 2006 motion to exclude expert testimony, September 26, 2006 motion for leave to file motion for leave to designate French-law expert, and March 2, 2007 supplemental motion to exclude expert testimony are denied.[30]

**SO ORDERED.**

June 5, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[30]There are two other pending motions in this case that are being decided in a separate memorandum opinion and order that is forthcoming: AMX's November 13, 2006 motion to strike Robert Hancock's supplemental report, and AMX's March 30, 2007 motion for leave to file motion to exclude expert witness.