IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AMX CORPORATION,                  §
                                  §
      Plaintiff-counterdefendant, §
                                  §  Civil Action No. 3:04-CV-2035-D
VS.                               §
                                  §
PILOTE FILMS,                     §
                                  §
      Defendant-counterplaintiff. §

MEMORANDUM OPINION
AND ORDER

In a prior opinion in this case, the court addressed cross-motions for summary judgment filed by plaintiff-counterdefendant AMX Corporation ("AMX") and defendant-counterplaintiff Pilote Films ("Pilote"). *See AMX Corp. v. Pilote Films*, 2007 WL 1695120 (N.D. Tex. June 5, 2007) (Fitzwater, J.) ("*AMX I*"). Pilote moves for partial reconsideration of *AMX I*. After obtaining leave of court, AMX has filed a second motion for partial summary judgment that addresses grounds that it failed to raise in its earlier motion. For the reasons that follow, the court grants in part and denies in part Pilote's motion to reconsider, and it grants AMX's second motion for partial summary judgment.

I

Much of the pertinent background facts and procedural history of this case are set out in *AMX I* and need not be repeated. *See AMX I*, 2007 WL 1695120, at *1-*2. The court will elaborate on both in its discussion of the issues presented by the parties' present motions.

A

In its motion, Pilote asks the court to reconsider its holding that Pilote's breach of contract claim fails because Pilote did not offer summary judgment evidence of each material term of the implied agreement. It maintains that AMX failed in its summary judgment motion to raise the issue of indefiniteness of all terms, Pilote responded with summary judgment evidence on the specific terms that AMX disputed, and, had Pilote been on notice that evidence on other extraneous terms was needed, it would have provided it. The court rejects this request.

B

In a summary judgment motion, "the burden on the moving party may be discharged by 'showing'——that is, pointing out to the district court——that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Although the moving party "need not support its motion with affidavits or other evidence," *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1995) (citing *Celotex Corp.*, 477 U.S. at 322), its motion should put the nonmoving party on notice that it must come forward with evidence in support of its claim, *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003).

In support of its motion for summary judgment, AMX included in its brief a subsection entitled "Pilote's Breach of Contract Claim

Based on the Alleged French Agreement Fails Because No French Agreement Ever Existed," P. July 31, 2006 Br. 7. AMX stated that, under French law, Pilote was required to "prove that AMX **expressly agreed to every material term** included in the contract," and it argued that Pilote "cannot point to any of the contractual terms it would have this Court enforce," *id.* at 11 (bold font and underlining in original). AMX then pointed to the testimony of Bettina Hulsmeyer and argued that "Pilote's corporate representative testified that AMX did not agree to one single contractual term of this alleged French Agreement." *Id.* AMX contended next that "Texas law regarding implied-in-fact contracts supports the same conclusion: **Pilote must establish all material terms** in the alleged French Agreement for the agreement to be enforceable." *Id.* at 12 (bold font in original). AMX quoted a Fifth Circuit opinion in which the court held that the alleged implied contract failed for indefiniteness.[1] AMX then asserted that "Pilote included only three allegations of breach in its amended counterclaims, but failed to establish the alleged French Agreement existed." *Id.* at 13.

The court holds that AMX raised the issue of indefiniteness by pointing to the absence of evidence that the parties had agreed to the essential terms of the implied agreement, thus shifting to

---

[1]AMX quoted *Willowood Condo. Ass'n v. HNC Realty Co.*, 531 F.2d 1249, 1251 (5th Cir. 1976).

Pilote the burden of producing evidence of specific facts showing there was a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. AMX pointed out that French and Texas law require evidence that the parties agreed on all material terms, cited a Fifth Circuit decision in which the panel held that an implied contract could not be enforced without evidence of all material terms, and stated that Pilote "failed to establish the alleged French Agreement existed." P. July 31, 2006 Br. 13. These assertions were clearly sufficient to notify Pilote of its obligation to produce evidence of the material terms of the implied agreement and of the parties' agreement to those material terms. *See, e.g., Malacara*, 353 F.3d at 404 ("Garber's motion for summary judgment did put [plaintiff] on notice that he needed to point to or submit evidence as to each element of the fraud cause of action. The motion listed the six elements of a fraud cause of action under Texas law and argued that Garber was entitled to summary judgment '[b]ecause Plaintiffs cannot prove any of these elements much less all of them.'").

Pilote posits that the only terms that AMX maintained Pilote could not prove—and thus the only issue on which AMX actually moved for summary judgment—were the terms that Pilote sought to enforce in its breach of contract counterclaim. Pilote contends that the court improperly granted summary judgment *sua sponte* on grounds that AMX did not raise in its initial motion. The court

disagrees. AMX pointed out that, under Texas and French law, for an implied contract to be enforceable, the party seeking enforcement must adduce evidence that the parties agreed to all the material terms; argued that Pilote could not establish agreement on all material terms; and bolstered its argument by pointing to specific contractual terms on which Pilote could not establish agreement. The fact that AMX argued that Pilote could not establish that the parties had agreed to the three specific contractual terms that Pilote sought to enforce does not change the court's conclusion that AMX properly pointed, initially, to the absence of any evidence that the parties had agreed to the material terms. Under settled Supreme Court and Fifth Circuit case law, this put Pilote on notice that it was obligated in response to produce evidence that the parties had agreed to all material terms and, therefore, that a contract did exist.

Accordingly, the court denies this basis of Pilote's motion to reconsider.[2]

---

[2]The court's conclusion is bolstered by arguments in Pilote's brief that establish that Pilote was on notice that AMX had raised the issue of indefiniteness. Pilote entitled the subsection "There is More Than Sufficient Evidence for a Jury to Determine the Terms of the French Agreement," D. Aug. 28, 2006 Br. 11. Pilote pointed in this section to several references in its appendix that purportedly established the "terms of the French Agreement." *Id.* at 12-13. It argued that "[t]o the extent AMX argues that Pilote must establish all material terms of the French Agreement, Art. L 110-3 of the French Commercial Code advises that these terms can be proved by any means, [and] [t]he evidence is therefore sufficient for the fact finder to determine what terms were included in the French Agreement." *Id.* at 14. Pilote's argument that it was

A

In *AMX I* the court granted summary judgment dismissing several of Pilote's counterclaims on the ground that it could not prove that it had been damaged. *See, e.g., AMX I*, 2007 WL 1695120, at *26, *28, and *30-*31. The premise for this conclusion was that Pilote was relying on the conduct of AMX U.K., Ltd. ("AMX UK"), and Pilote had failed to adduce evidence that AMX UK and AMX were "the same entity," i.e., that they were a "single business enterprise."

Pilote moves the court to reconsider the holding that Pilote did not adduce sufficient evidence of a single business enterprise. It posits that in its motion for summary judgment, AMX never contested the existence of a single business enterprise. Pilote maintains that the words "single business enterprise" are nowhere found in AMX's motion, and it argues that before it read AMX's reply brief, it was not on notice that the unity of the AMX entities was a contested issue. Pilote points to the testimony of AMX's CEO, Rashid Skaf ("Skaf"), contending that Skaf admitted that the various companies operated as one, and it suggests that the court did not consider this evidence when reaching its decision.[3]

---

unaware of AMX's indefiniteness argument until AMX filed its reply brief is undermined by the fact that Pilote addressed this argument, albeit unsuccessfully, in its response brief.

[3]The court rejects the suggestion that it did not consider Skaf's testimony in deciding *AMX I*. The court considered all of the evidence that Pilote adduced in its response, including the

The court grants this ground of Pilote's motion to reconsider. AMX was not required, of course, to use the term "single business enterprise" in its summary judgment motion to shift the burden to Pilote to produce evidence that would establish a single business enterprise. It was simply required to point to the absence of evidence that Pilote had been damaged by AMX's conduct and that AMX UK's actions were legally attributable to AMX. It is therefore of no moment that AMX did not use the "single business enterprise" in its summary judgment motion.

AMX was obligated, however, to notify Pilote that it was moving for summary judgment based on the absence of evidence that AMX UK's conduct could be attributed to AMX, and therefore that Pilote was not damaged by AMX, the party it is suing. AMX moved for summary judgment on the following grounds: (1) on Pilote's common law misappropriation claim, it pointed to the absence of evidence that AMX had gained a special advantage by allegedly misappropriating Pilote's trade secrets or that AMX had used Pilote's trade secrets to compete with Pilote; (2) on Pilote's trade secret misappropriation claim, it pointed to the absence of evidence that Pilote had suffered any injury by any alleged trade

---

deposition testimony of Michael Olinger and Skaf. It determined that this evidence was insufficient of itself to create a genuine issue of material fact on the existence of a single business enterprise.

secret misappropriation; (3) on Pilote's restitution/unjust enrichment claim, it pointed to the absence of evidence that AMX was obtaining profits or other economic benefits based on the use of Pilote's customer information; and (4) on Pilote's French law breach of exclusivity with a third party contract claim, it pointed to the absence of evidence that AMX had direct or indirect involvement in the French market or that Pilote had suffered any damage as a result of AMX's conduct. AMX did not adequately point to the absence of evidence that AMX UK's conduct could be attributed to AMX, so that the burden shifted to Pilote to produce evidence that the two companies operated as a single business enterprise. AMX was on notice that Pilote intended to contend that AMX and AMX UK operated as a single business enterprise.[4] If AMX intended to move for summary judgment on the basis that AMX UK's conduct (e.g., sales) could not be attributed to AMX, it was obligated to move for summary judgment on this basis. The court therefore agrees with Pilote that it was error for the court to grant summary judgment on a ground that AMX had not adequately raised. *See, e.g., John Deere Co. v. Am. Nat'l Bank, Stafford*, 809 F.2d 1190, 1192 (5th Cir. 1987) (holding that it is error to grant

---

[4]In Pilote's first amended counterclaims, it alleges that "AMX also integrated its resources with AMX UK LTD. and AMX LTD. Belgium, forming a single business enterprise." Am. Countercls. ¶ 10. Although AMX denied this allegation in its reply to the counterclaims, it had notice that Pilote was asserting that acts of AMX UK were attributable to AMX on the ground that the two companies operated as a single business enterprise.

summary judgment on ground not raised). The court therefore grants this ground of Pilote's motion to reconsider.

IV

A

After granting a motion to reconsider of this type, the court would normally schedule the submission of additional briefing and evidence so that the summary judgment nonmovant, now having adequate notice, could attempt to defeat summary judgment on the ground in question. In this case, that would mean allowing Pilote the time required by Fed. R. Civ. P. 56(c) to produce additional evidence to establish its single business enterprise theory. Because the court has permitted AMX to file a second motion for partial summary judgment, however, Pilote has already had the opportunity in responding to AMX's motion to adduce evidence that AMX and AMX UK operated as a single business enterprise. AMX has, in turn, been able to reply to Pilote's evidence in a reply brief.[5] Because it would delay the final resolution of this case and

_____

[5]AMX filed on July 31, 2007 objections to the evidence that Pilote submitted in opposition to AMX's second motion for partial summary judgment. To the extent AMX objects to evidence on which the court has not relied, the court overrules the objections as moot. Insofar as AMX objects to Pilote's evidence in support of its single business enterprise theory, based on a lack of authentication, the court overrules these objections. Under Fed. R. Evid. 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Pilote has met this requirement.

unjustifiably increase Pilote's attorney's fees and expenses by requiring Pilote to file additional summary judgment briefing in which it relies on the same evidence, the court will decide, based on the evidence and briefing already on file, whether Pilote has adduced sufficient evidence to permit a reasonable jury to find that AMX and AMX UK operated as a single business enterprise.

B

"The 'single business enterprise theory' is based on equity and arises from partnership principles: it applies when corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose." *El Puerto De Liverpool, S.A. De C.V. v. Servi Mundo Llantero S.A. De C.V.*, 82 S.W.3d 622, 636-37 (Tex. App. 2002, pet. dism'd w.o.j.) (citing *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 120 (Tex. App. 2001, no pet.)). In determining whether two corporations are operated as a single business enterprise, courts consider a list of non-exhaustive factors, including:

> (1) common employees, (2) common offices, (3) centralized accounting, (4) payment of wages by one corporation to another corporation's employees, (5) common business name, (6) services rendered by the employees of one corporation on behalf of another corporation, (7) undocumented transfers of funds between corporations, and (8) unclear allocation of profits and losses between corporations.

*Id.* at 637 (citing *Rio Grande Valley Gas Co. v. City of Edinburg*, 59 S.W.3d 199, 208-09 (Tex. App. 2000, no pet.), *modified on other*

*grounds*, *PG&E Gas Transmission v. City of Edinburg*, 59 S.W.3d 225
(Tex. App. 2001, no pet.); *Paramount Petroleum Corp. v. Taylor
Rental Ctr.*, 712 S.W.2d 534, 536 (Tex. App. 1986, writ ref'd
n.r.e.)).

C

Having considered the evidence and the relevant factors, the
court concludes that Pilote has raised a genuine issue of material
fact on the question whether AMX and AMX UK operated as a single
business enterprise.  As evidence of common employees, Pilote
points to the organizational structure of AMX, explaining that Tim
Penn ("Penn") from AMX UK, reports directly to Michael Olinger
("Olinger") from AMX, and that Catherine Berriat ("Berriat"), an
employee of AMX, reports directly to Penn.  It also cites proof
that AMX employees were being compensated by AMX UK.  Pilote's
evidence would enable a reasonable jury to find that Berriat was
compensated for her work as a consultant for AMX through AMX UK;
that even after Berriat was hired as an AMX employee, she was paid
through AMX's UK office in York; and that although Berriat was
employed first as a consultant for AMX and later as an employee of
AMX, arrangements for her laptop and rental car were made through
AMX's Belgium and UK offices.  AMX and AMX UK share a common
business name.  Additionally, Pilote relies on evidence that AMX's
corporate representatives referred to AMX as "one big unit," and
that AMX represents to the public that AMX UK and AMX Ltd. Belgium

("AMX Belgium") are simply AMX offices.  For example, Pilote points
to a news release in which AMX stated: "AMX now provides increased
sales, training and technical support to its European partners from
its offices in York, England," D. July 16, 2007 App. 208, and to
AMX's 2002 Annual Report, in which it represented that "in order to
provide quality and timely customer support, the Company has also
established offices in Philadelphia, Costa Mesa, Tampa, Denver,
Toronto, York (U.K.), Mexico City, Shanghai, Brussels, and
Singapore," *id.* at 215.  As evidence of services rendered by the
employees of one corporation on behalf of another, Pilote cites
evidence that AMX, AMX UK, and AMX Belgium worked together to
organize the Road Show in France and to provide technical services
to AMX clients.  In his deposition, Olinger testified that "We
[AMX] also are able to use our technical sales experts in, in
Belgium where necessary.  And in addition to that, we bring in
people from our UK operation to make visits as well."  *Id.* at 18.
And in an email from Douglas Davis ("Davis"), an AMX employee, to
Penn, an AMX UK employee, Douglas inquired: "Do you have any French
speakers in tech support in York?  I'm working on the biz plan for
France and I want to assess our corporate capability to provide
competitively superior technical support in France."  *Id.* at 249.
Further, in an email, Berriat asked one of the AMX Belgium
employees for assistance in obtaining support for the employees of
one of AMX's clients.  Pilote also points to evidence in which AMX

stated that it would pay one of its vendors out of "the UK office"; that it planned to ship its product literature to the UK office and then transfer it to Belgium; that AMX was using employees of AMX UK in dealing with Pilote; and that Berriat was coordinating and orchestrating the sale of AMX products to French dealers through AMX UK. Finally, Pilote relies on proof that AMX represented in its 2004 10-K that "[a]pproximately 12%, 14%, and 12% of identifiable assets for the years ended March 31, 2004, 2003, and 2002, respectively, were located outside of the U.S., primarily in the United Kingdom." *Id.* at 211. This evidence would enable a reasonable jury to find that AMX treated the assets of AMX UK as its own. Based on this evidence, the court holds that Pilote has raised a genuine issue of material fact whether AMX and AMX UK constitute a single business enterprise.

AMX argues in its reply brief that Pilote has not raised a fact issue because it merely listed the nine factors related to single business enterprise, followed by fourteen pages of argument, in which it did not classify the evidence that supported which factor (assuming the evidence did so at all). AMX argues that Pilote has, at best, offered proof of nothing more than employees of one company communicating and working with employees of another, and that this is insufficient as a matter of law to establish a single business enterprise. The court disagrees, and it concludes that Pilote's evidence raises a genuine issue of material fact on

the question of single business enterprise.

V

In light of the court's conclusion, it must reconsider its decisions in *AMX I* granting summary judgment on the basis that Pilote had failed to raise a genuine issue of material fact on the question of single business enterprise. For the reasons that follow, the court concludes in §§ V-IX of this memorandum opinion that AMX is still entitled to summary judgment——albeit on other grounds——as to several counterclaims, but that summary judgment must be denied as to two counterclaims that the court dismissed in *AMX I.*

A

Pilote asserts a counterclaim for common law misappropriation, alleging that it developed its trade secrets through extensive time, labor, skill, and money and that AMX used these trade secrets in competition with Pilote, thereby gaining a special advantage because AMX was burdened with little or none of the expense Pilote incurred. AMX moved for summary judgment on this counterclaim, alleging that Pilote could not demonstrate that AMX gained a special advantage by allegedly misappropriating Pilote's trade secrets, that Pilote was unable to show how AMX used Pilote's trade secrets to compete with Pilote, and that Pilote could not prove what, if any, harm it sustained due to AMX's alleged trademark infringement. Pilote responded by arguing that AMX used Pilote's

- 14 -

customer list, which Pilote maintains is a trade secret, to contact Pilote's dealers and to sell at least $48,194.74 of products to Pilote's dealer, TVSAT2 Design, in France, thereby causing Pilote to lose sales of AMX products to its dealers.

B

Under Texas common law, to prove a claim for misappropriation, the plaintiff must establish

> (i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff.

*U.S. Sporting Prods., Inc. v. Johnny Steward Game Calls, Inc.*, 865 S.W.2d 214, 218 (Tex. App. 1993, writ denied) (citing *Synercom Tech., Inc. v. Univ. Computing*, 474 F. Supp. 37, 39 (N.D. Tex. 1979) (Higginbotham, J.)).

AMX pointed to the absence of evidence that it "used" Pilote's customer list in competition with Pilote. Pilote responded that AMX used Pilote's customer list to contact TVSAT2 Design and ultimately sell $48,194.74 in products to TVSAT2 Design in competition with Pilote, causing Pilote to lose sales. But it is undisputed that during a visit to France, Pilote "introduc[ed] AMX to "some of its dealers, including TVSAT2 Design." D. Aug. 28, 2006 Br. 4. It is also undisputed that Pilote never actually

"releas[ed] the entire customer list to AMX." *Id*. at 30. Rather, it merely "releas[ed] the identity of specific dealers in good faith in furtherance of the French Agreement." *Id*.

A customer list can constitute a protected trade secret under Texas law. *See, e.g. Hyde Corp v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958) (quoting Restatement of Torts § 757) (trade secrets may include any "compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," and "may be . . . a list of customers."); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App. 1998, pet. dism'd) ("Items such as customer lists, pricing information, client information, customer preferences, buyer contacts . . . have been shown to be trade secrets."). And a person can be liable for use of a trade secret if his use, after he properly acquired knowledge of the secret, constitutes a breach of the confidence reposed in him. *Hyde Corp*., 314 S.W.2d at 769. If Pilote had given AMX a copy of its customer list in confidence, and AMX used the customer list to learn the names of Pilote's French dealers and contact the French dealers in order to compete with Pilote, then Pilote might be able to establish a claim for misappropriation. Here, however, Pilote has adduced no evidence that AMX even received a copy of Pilote's customer list. And it is undisputed that Pilote introduced AMX to TVSAT2 Design. Consequently, a reasonable jury

could not find that it was through the *customer list* that AMX
learned that TVSAT2 Design was one of Pilote's clients. And
although Pilote maintains that it "releas[ed] the identity of
specific dealers in good faith in furtherance of the French
Agreement," D. Aug. 28, 2006 Br. 30, and that it "had confidence
that AMX would use the visit to further the relationship between
the Parties not for some other purpose," *id.* at 31, Pilote has not
adduced evidence (or even argued) that its release of TVSAT2
Design's identity to AMX was confidential. The coincidental fact
that TVSAT2 Design's name also appears on Pilote's customer list
does not convert AMX's contact with TVSAT2 Design into
misappropriation of a trade secret. And Pilote has introduced no
evidence that AMX used Pilote's customer list to discover the name
of, and begin a business relationship with, any of Pilote's *other*
dealers. Finally, although Pilote maintains that the customer list
also tracks the amount of AMX products that each dealer on the list
purchased, Pilote has not produced evidence that it disclosed any
customer information to AMX other than the client's name.

     The court therefore holds that Pilote has not adduced evidence
that would permit a reasonable jury to find that AMX was using
Pilote's protected *customer list* when it contacted and sold
products to TVSAT2 Design. Instead, the evidence would only enable
the reasonable finding that AMX began its relationship with TVSAT2
Design as a result of the meeting Pilote arranged. Accordingly,

because Pilote cannot establish that AMX used Pilote's customer list to compete with Pilote, the court adheres to its decision in *AMX I* granting AMX's motion for summary judgment dismissing this counterclaim.

## VI

### A

Pilote also asserts a counterclaim under Texas law for trade secret misappropriation, alleging that AMX misappropriated Pilote's trade secrets by acquiring them through improper means and using them for its own commercial benefit without Pilote's authorization, knowing that the trade secrets had been obtained through improper means. To prevail on this counterclaim, Pilote must establish "(1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) damages." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App. 2004, pet. denied) (citing *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 476 (Tex. App. 2001, pet. denied)). AMX moved for summary judgment on this counterclaim, arguing that Pilote could not establish the existence of any alleged trade secrets or that any such confidential information was indeed shrouded in secrecy, and that Pilote could not establish that it has suffered any injury as a result of any alleged trade secret misappropriation.

The court will assume *arguendo* that Pilote's customer list constitutes a trade secret under Texas law. *See, e.g. Hyde Corp*, 314 S.W.2d at 776; *T-N-T Motorsports, Inc.*, 965 S.W.2d at 22. As evidence that it has suffered injury as a result of trade secret misappropriation, Pilote argued that AMX used Pilote's trade secrets to sell approximately $48,000 of AMX products to a Pilote dealer in France during the time that Pilote was AMX's exclusive distributor in France. While Pilote's evidence may establish that Pilote suffered an injury (the loss of $48,000 in sales), the evidence does not establish that this injury was caused by any trade secret misappropriation. As explained *supra* at § V(B), Pilote introduced AMX to TVSAT2 Design during a visit to France, and the evidence establishes that Pilote never released a full copy of its customer list to AMX. Because the evidence only permits the reasonable finding that AMX developed its relationship with TVSAT2 Design as a result of Pilote's introduction, not as a result of any use of Pilote's customer list, the court holds that AMX is still entitled to summary judgment dismissing this counterclaim.

## VII

### A

Pilote asserts a counterclaim for restitution/unjust enrichment under common law and Article 1371 of the French Civil Code. AMX moved for summary judgment on this claim, arguing that

Pilote could not establish that AMX was "obtaining profits or other economic benefits based on the use of Pilote's customer information (the 'Trade Secrets') that is not covered by contract."  P. July 31, 2006 Br. 27.  Pilote responded that the evidence was sufficient to raise a genuine fact issue that AMX had used Pilote's trade secrets to sell approximately $48,000 of AMX products to a Pilote dealer in France during the time that Pilote was AMX's exclusive distributor in France.

B

The court has concluded above, *see supra* §§ V(B) and VI(B), that evidence of sales of AMX products to TVSAT2 Design does not alone permit the reasonable finding that AMX "used" Pilote's customer list, given that AMX never disclosed its customer list to Pilote and in fact introduced AMX to TVSAT2 Design during AMX's visit to France.  Accordingly, the court holds that Pilote cannot establish its counterclaim for restitution/unjust enrichment, because AMX has pointed to the absence of evidence that AMX is "obtaining profits or other economic benefits based on the use of Pilote's customer information (the 'Trade Secrets') that is not covered by contract," and Pilote has not adduced sufficient evidence that would enable a reasonable jury to find that AMX has used Pilote's customer information.  Accordingly, the court adheres to its decision in *AMX I* dismissing this counterclaim.

Pilote also asserts a counterclaim under Article L. 442-6 6° of the French Commercial Code for breach of exclusivity by interference with a third party contract. AMX argued that this counterclaim failed because Pilote could not establish that AMX had "direct and/or indirect involvement in the French market in violation of the prohibition on reselling outside the network imposed on Pilote by its exclusive distribution agreement with AMX," or that Pilote suffered any damage as a result of AMX's conduct. P. July 31, 2006 Br. 29. Pilote responded that "whatever the governing agreement was between the Parties, it included an exclusivity provision," D. Aug. 28, 2006 Br. 42, pointing to its evidence of an exclusivity agreement in the implied French Agreement, and arguing that the exclusivity did not end until February 1, 2005. Pilote then cited evidence of numerous sales of AMX products by AMX UK to TVSAT2 Design, one of Pilote Films's dealers in France, beginning as early as August 6, 2004. Pilote argued that this evidence was dispositive of AMX's breach of the exclusivity by interference with third party contract under French law and the French Agreement, as well as breach of the 1994 Agreement, if it still existed.

Because of the possibility that the trial of this case will establish that one of the estoppel doctrines applies⸺meaning that the parties will be estopped from arguing that the 1994 Agreement does not control⸺*see AMX I,* 2007 WL 1695120, at *10⸺the court holds that there is a fact issue that precludes summary judgment on this counterclaim. If the 1994 Agreement controls, then a reasonable jury could find, based on AMX UK's sale of products to TVSAT2 Design, that Pilote is entitled to recover on its French-law breach of exclusivity by interference with third party contract counterclaim. Accordingly, the court denies AMX's motion for summary judgment as to this counterclaim.[6]

IX

A

AMX moved to dismiss Pilote's unfair competition counterclaim by arguing that although Pilote alleged that AMX was liable for trademark infringement, common law misappropriation, and trade

---

[6]In *AMX I* the court denied as moot AMX's July 31, 2006 motion to exclude expert testimony, September 26, 2006 motion for leave to file motion for leave to designate French law expert, and March 2, 2007 supplemental motion to exclude expert testimony, because the court had determined that Texas law governed the contractual relationship between AMX and Pilote, and it had dismissed all of Pilote's French-law counterclaims. *AMX I,* 2007 WL 1695120, at *14 n.13. It is not clear to the court that it need now address the merits of any part of these motions. The court provides below, however, that within 14 days of the date this memorandum opinion and order is filed, a party may identify in writing a component that it maintains is not moot, state briefly the reason for its position, and request a ruling.

secret misappropriation, together with a plethora of claims under French law, Pilote could not establish the essential elements of these causes of action; therefore, Pilote could not prove any underlying substantive tort or other illegal conduct that could constitute an act of unfair competition. In *AMX I* the court dismissed Pilote's unfair competition counterclaim based on Pilote's failure to raise a fact issue on any of its counterclaims. *See AMX I,* 2007 WL 1695120, at *24. Having reconsidered Pilote's counterclaims in light of the conclusion that Pilote has established a fact issue on the question of single business enterprise, the court has held above, *see supra* § VIII(B), that Pilote's counterclaim under French law for breach of exclusivity by interference with a third party contract survives summary judgment. The rationale for the court's decision in *AMX I* rejecting the unfair competition no longer holds.

As explained in *AMX I*, under Texas law, "unfair competition" is "a general rubric under which fall all statutory and non-statutory causes of action arising out of dishonesty in industrial or commercial matters." *Keane v. Fox Television Stations, Inc.*, 297 F.Supp.2d 921, 938 (S.D. Tex. 2004) (citing *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). To prevail on this claim, "the plaintiff must show that the defendant committed an illegal act that interfered with the plaintiff's ability to conduct its business; the illegal

act need not necessarily violate criminal law, but must at least be an independent tort." *Id.* (citing *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000)). "Without some finding of an independent substantive tort or other illegal conduct . . . liability cannot be premised on the tort of 'unfair competition.'" *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904-05 (Tex. App. 1989, writ denied).

AMX only moved for summary judgment on Pilote's unfair competition counterclaim based on Pilote's inability to establish an independent tort. Pilote has raised a fact issue on the question whether AMX violated Article L. 442-6 6° of the French Commercial Code. AMX did not move to dismiss Pilote's unfair competition counterclaim by arguing that a violation of Article L. 442-6 6° of the French Commercial Code would not suffice as an independent tort on which Pilote could base its counterclaim for unfair competition under Texas law. Accordingly, the court holds that AMX is not entitled to summary judgment dismissing Pilote's unfair competition counterclaim.

X

The court now turns to the third ground on which Pilote seeks reconsideration. In *AMX I* the court granted summary judgment dismissing Pilote's counterclaim for sudden breaking off an established business relationship, in violation of Article 442-6 5° of the French Commercial Code and 1134 of the French Civil Code.

*AMX I*, 2007 WL 1695120, at *30.  Pilote seeks reconsideration of the court's ruling dismissing this counterclaim on the grounds that AMX's notice to Pilote was sufficient under French law.

A

Pilote maintains that this court's decision in *AMX I* was premature because facts on the issue of adequate notice went both ways,[7] and factual disputes must be resolved by the jury after a full trial, not based on an incomplete summary judgment record. Pilote contends that although in a case litigated in France the decision is to be made by the judge, in a suit tried in the United States (which recognizes a right of jury trial in civil cases), the decision must be made by the jury, after a full trial of the disputed facts.  The court denies this ground of Pilote's motion to reconsider, but it agrees that the basis for its ruling must be revised.  The court therefore withdraws § XV(B) of *AMX I*, *see AMX I*, 2007 WL 1695120, at *30, and substitutes the following as the basis for granting summary judgment in favor of AMX on this counterclaim.

---

[7]Pilote maintains that "[a]s the Court noted, facts on the issue of adequate notice went both ways."  D. Mot. Reconsider 7. The court clarifies that it did not hold in *AMX I* that fact issues "went both ways."  Rather, it concluded that it was undisputed that Pilote was able to replace AMX within one month of the end of their relationship; AMX did not constitute the entirety of Pilote's business; and Pilote did not have difficulty reorganizing its business after the termination of its relationship with AMX.  It is *these* undisputed facts on which the court based it conclusion in *AMX I*, and it is these same undisputed facts on which the court bases today's decision.

In addressing the question whether notice was sufficient in breaking off an established relationship, the Appeal Court Lyon explained: "[i]n order to investigate what constitutes a reasonable or sufficient notice period, one has to dwell on the circumstances surrounding the facts pertaining to the broken commercial relationship." P. July 31, 2006 FLA App. 51.[8] Considering the undisputed circumstances surrounding the termination of the relationship between AMX and Pilote, the court concludes that Pilote has failed to raise a genuine issue of material fact that eight months' notice was insufficient.

In its summary judgment motion, AMX cites evidence that within a month of February 2005, Pilote began marketing and selling the products of AMX's direct competitor, Crestron; Pilote also distributed and sold other unrelated products and was never solely dependent on AMX for its business; and Pilote's ability to

----

[8]    The court recognizes that, as a civil law country, the decision of a French court——here the Appeal Court Lyon——has no binding effect. The court cites the Appeal Court Lyon's explanation and reasoning, not as binding precedent, but as a helpful explanation of, and persuasive authority concerning, the appropriate role for the court in deciding Pilote's sudden breaking off claim.

*AMX I*, 2007 WL 1695120, at *30 n.27 (citations and quotation marks omitted).

reorganize its business activity was not hindered, as evidenced by Pilote's nearly immediate sale of AMX's competitor's products. In response, Pilote does not dispute that it began working for Crestron one month after the end of the relationship, that it was never solely dependent on AMX for business, and that its ability to reorganize its business activity was not hindered by AMX's termination of the relationship. Rather, it relies on the opinion of its expert, who opines that "the most frequent delay between first contact with a prospect and the final installation of AMX equipment at this client is from six to eighteen months." D. Aug. 28, 2006 Br. 37. It also posits that, based on this view of French commercial practices, AMX's notice was insufficient.

The court holds that the opinion of Pilote's expert that notice was insufficient is insufficient to enable a reasonable jury to find that, given the circumstances surrounding the relationship between AMX and Pilote, eight months' notice was insufficient. Even accepting as true the evidence of Pilote's expert that the delay between first contact with a prospect and final installation of AMX equipment is from six to eighteen months, a reasonable jury could not find that eight months was inconsistent with the minimum notice period under French commercial practices.[9]

---

[9]Pilote argues in a footnote in its motion to reconsider that in securing a sales relationship with Crestron, Pilote was not able to make an "apples-to-apples" substitution, because Pilote was limited to selling Crestron products only to those dealers who did not already purchase products from Crestron France. Pilote did not

The court therefore grants summary judgment dismissing Pilote's counterclaim for sudden breaking off an established business relationship, in violation of Article 442-6 5° of the French Commercial Code and 1134 of the French Civil Code.

XI

Having addressed Pilote's motion to reconsider, the court now turns to AMX's supplemental motion for summary judgment.

AMX seeks summary judgment dismissing Pilote's claims for conversion, interference with contractual/business relationships, and business disparagement. Because AMX will not have the burden of proof at trial on any of these claims, it can obtain summary judgment by pointing the court to the absence of evidence to support an essential element of the claim in question. *Celotex Corp.*, 477 U.S. at 325. Once AMX does so, Pilote must go beyond its pleadings and designate specific facts showing there is a

---

adduce this evidence, however, in response to AMX's motion for summary judgment. In fact, Pilote produced no evidence to refute AMX's contention that Pilote had replaced AMX within one month and that Pilote's ability to reorganize its business was not hindered by AMX's eight-month notice. Pilote cannot now, through a motion to reconsider, augment its opposition response to add evidence that it could have presented beforehand. *See, e.g., Hurt v. Ecolab, Inc.*, 2006 WL 1947791, at *3 (N.D. Tex. July 13, 2006) (Kaplan, J.) ("Motions for reconsideration are not a vehicle to permit a party to rehash arguments it could or should have made in its initial motion."); *Avco Corp. v. Precision Airmotive, Inc.*, 2005 WL 174867, at *1 (N.D. Tex. Jan. 24, 2005) (Kinkeade, J.) (order) ("Motions for reconsideration are permitted only in narrow situations, 'primarily to correct manifest errors of law or fact or to present newly discovered evidence.'" (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)).

genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). Summary judgment is mandatory if Pilote fails to meet this burden. *Little*, 37 F.3d at 1076. An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Pilote's failure to produce proof as to any essential element renders all other facts immaterial. *Edgar v. Gen. Elec. Co.*, 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.) (citing *Celotex Corp.*, 477 U.S. at 323).

## XII

The court begins with Pilote's counterclaim for conversion, in which Pilote alleges that AMX wrongfully exercised dominion or control over its trade secrets by obtaining such property through tortious and/or improper conduct.

### A

AMX moves for summary judgment on this claim, arguing that the property allegedly converted is intangible property; Pilote cannot prove that it owned any trade secrets; Pilote cannot prove improper use by AMX of the alleged trade secrets; Pilote cannot establish that it suffered any injury as a result of such alleged conversion and cannot prove that receipts by AMX UK resulted from actions of AMX, since AMX UK is a wholly separate business entity; and Pilote cannot establish that AMX and AMX UK were operating as a single

business entity when the products were sold to TVSAT2 Design, and, regardless, under the doctrine of quasi-estoppel, Pilote is estopped from arguing that AMX and AMX UK are a single business entity because Pilote has previously argued that the two are separate, distinct entities, and, under the doctrine of judicial estoppel, Pilote is precluded from asserting that the two entities operated as a single business enterprise because Pilote was successful before a Belgian trial court based in part on the argument that the two entities were distinct.

Pilote responds by pointing to Texas law allowing conversion claims for customer lists and arguing that its "trade secrets," i.e., the partial list of customers that Pilote shared with AMX, are a proper subject of its conversion claims; by relying on the arguments it made in its response to AMX's first motion for summary judgment, contending that it established that its customer list is a trade secret; by arguing that AMX improperly used Pilote's trade secrets when AMX UK contacted Pilote's dealer, TVSAT2 Design, and eventually sold over $48,000 of AMX products to this dealer; and by pointing to evidence that AMX and AMX UK constituted a single business enterprise, and contending that neither the doctrine of quasi-estoppel nor the doctrine of judicial estoppel precludes Pilote from arguing that AMX and AMX UK constituted a single business enterprise.

Under Texas law, conversion is defined as the wrongful exercise of dominion and control over another's property, in denial of or inconsistent with his rights. *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 622 (Tex. 1992). The court will assume *arguendo* that Texas law would permit a conversion claim based on the misappropriation of trade secrets communicated to AMX, that Pilote's customer list constituted a trade secret, and that AMX and AMX UK operated as a single business enterprise. The court holds nevertheless that Pilote has not adduced evidence that would enable a reasonable jury to find that AMX improperly used the alleged trade secrets.

AMX points out that Pilote has offered no proof that AMX exercised wrongful dominion over any customer information or other trade secrets that Pilote allegedly owned. Although Pilote cites sales by AMX UK to Pilote's dealer, TVSAT2 Design, the court is unable to discern how the relationship and eventual sales between AMX UK and TVSAT2 Design could reasonably be found to constitute conversion of Pilote's trade secrets. It is undisputed that Pilote introduced AMX to TVSAT2 Design during AMX's visit to France. And, as explained above, *see supra* §§ V(B) and VI(B), the mere fact that TVSAT2 Design is one of the customers listed on Pilote's secret customer list does not render AMX's further contact with TVSAT2 Design (after Pilote introduced them), conversion of a trade

secret.  Pilote has not produced evidence that it ever provided AMX a copy of its customer list or that it did anything more than share with AMX the names of certain clients.  Pilote cites no other dealers whom AMX improperly contacted, and, other than its customer list, Pilote points to no other trade secret that AMX allegedly converted.

Accordingly, the court holds that Pilote has failed to raise a genuine issue of material fact regarding whether AMX "exercised wrongful dominion" over Pilote's customer list.  AMX's contact with, and eventual sale of products to, TVSAT2 Design does not constitute "conversion" of Pilote's customer list.  The court therefore grants AMX's motion for summary judgment dismissing this counterclaim.

XIII

Pilote alleges that through negligent misrepresentation and the misappropriation and theft of trade secrets, AMX willfully interfered with Pilote's contractual and/or business relationships with its employees, customers, and other businesses.

A

1

The court begins with Pilote's tortious interference with prospective business relationships counterclaim.  AMX argues, *inter alia*, that, to the extent this counterclaim is based on interference with business relationships, it must fail because

Pilote has produced no evidence of an independently tortious act by AMX that caused interference. Pilote responds, *inter alia*, that it has adduced sufficient evidence that AMX committed an independent tort, arguing that the proof is sufficient for the jury to find AMX liable for one of the torts involving trade secret misappropriation.

2

Under Texas law,

> To prevail on a claim for tortious interference with prospective business relations, a plaintiff must show (1) a reasonable probability that the plaintiff and a third party would have entered into a contractual relationship; (2) that an independently tortious or wrongful act by the defendant prevented the relationship from occurring; (3) that the defendant did the act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of the conduct; and (4) that the plaintiff incurred actual harm or damage as a result of the defendant's interference.

*Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 632-33 (Tex. App. 2007, pet. filed) (citing cases) (citations omitted). As an independently tortious or wrongful act, Pilote points to "the torts involving trade secret misappropriation." D. July 16, 2007 Br. 33.

The court concluded in *AMX I*, 2007 WL 1695120, at *26-*27, that AMX is entitled to summary judgment dismissing Pilote's counterclaims for trade secret misappropriation and common law

misappropriation, and it has determined above, *see supra* § XII(B),
that AMX is entitled to summary judgment dismissing Pilote's
counterclaim for conversion. Pilote points to no other independent
tort, aside from those based on "trade secret misappropriation,"
that can serve as the basis for its interference with prospective
business relations, or interference with prospective contractual
relations claims. Accordingly, the court holds that Pilote has
failed to raise a genuine fact issue on the existence of an
independent tort, and it grants summary judgment dismissing
Pilote's tortious interference with prospective business relations
counterclaim.

B

1

AMX maintains that Pilote's tortious interference with
contract counterclaim must be dismissed because Pilote has produced
no evidence of a contract with which AMX interfered; Pilote has
produced no evidence that any action by AMX was the proximate cause
of any injury; and Pilote has produced no evidence that it incurred
actual damages as the result of AMX's conduct.

Pilote responds that it has adduced sufficient evidence of a
contract with which AMX interfered, citing the employment contracts
Pilote had with its employees and to evidence of an email exchange
that it maintains demonstrates that AMX had sufficient knowledge
that would lead a reasonable person to believe that a contract

existed; that AMX caused or brought about an interference with Pilote's employment contracts with its employees, citing communications that AMX had with Pilote employees that made it more difficult for them to accomplish their work; and that Pilote suffered damages because AMX made it more difficult for Pilote employees to perform their work in the French market.

2

The elements of a cause of action for tortious interference with contractual relations are (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) that was a proximate cause of the plaintiff's damages; and (4) actual damage or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (citing *Juliette Fowler Homes v. Welch Assocs.*, 793 S.W.2d 660, 665 (Tex. 1990); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App. 1992, writ denied)). Pilote relies on Texas law that describes "interference" as including "any act which retards, makes more difficult, or prevents performance." *Exxon Corp. v. Miesch*, 180 S.W.3d 299, 339 (Tex. App. 2005, pet. granted) (citing *Seelbach v. Clubb*, 7 S.W.3d 749, 757 (Tex. App. 1999, pet. denied)). But it points to no specific evidence that any of AMX's actions interfered with Pilote's contractual relationships with its employees, such that Pilote suffered damages. Pilote relies on an email exchange between AMX and one Pilote employee, Thierry Del Soccoro, and alleges that the

"'discreet' communications with Pilote's employees made it more difficult for them to accomplish their work for Pilote as they were distracted and spent time communicating with AMX." D. July 16, 2007 Br. 38. But it fails to cite evidence contained in the summary judgment record that supports this allegation.

Pilote also argues that it suffered damages because "AMX retarded and made it more difficult for Pilote's employees to perform their work in the French market on behalf of Pilote." *Id.* But aside from making the conclusory assertion, Pilote cites no summary judgment proof that it actually suffered these damages.

Accordingly, the court holds that Pilote has not created a genuine issue for trial on the question either of causation or of damages as a result of AMX's contact with Pilote's employees.

XIV

Finally, AMX moves for summary judgment on Pilote's business disparagement counterclaim. It argues that Pilote cannot establish that AMX published any disparaging words that were false; Pilote has produced no evidence that AMX acted with malice; Pilote has produced no evidence that AMX had no privilege with respect to the alleged statements; and Pilote has produced no evidence that publication of the alleged statements caused Pilote special damages. Pilote has not responded to this argument, and it has not adduced evidence that would enable a reasonable jury to find in its favor. Although this failure does not permit the court to enter a

"default" summary judgment on this counterclaim, the court may accept AMX's evidence as undisputed. *See Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.). Additionally, "[a] summary judgment nonmovant who does not respond to the motion is relegated to [its] unsworn pleadings, which do not constitute summary judgment evidence." *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)). The court therefore grants AMX's motion for summary judgment and dismisses Pilote's business disparagement counterclaim.

*     *     *

Accordingly, the court grants in part and denies in part Pilote's June 8, 2007 "motion to reconsider three discre[te] legal issues contained in the court's June 5, 2007 opinion." Having reconsidered its conclusion in *AMX I* that Pilote failed to raise a fact issue on the question of single business enterprise, the court holds that Pilote *has* raised a genuine issue of material fact. As a result of this decision, the court has also revisited each of Pilote's counterclaims that the court dismissed based on this now-vacated premise. It holds that notwithstanding its contrary rulings in *AMX I*, AMX is not entitled to summary judgment dismissing Pilote's counterclaim under Article L. 442-6 6° of the French Commercial Code for breach of exclusivity by interference

with a third party contract, or its counterclaim for unfair competition.

The court grants AMX's June 25, 2007 second motion for partial summary judgment, and it dismisses Pilote's claims for conversion, tortious interference with business and contractual relationships, and business disparagement.

As the court explains *supra* at note 6, in *AMX I* the court denied as moot AMX's July 31, 2006 motion to exclude expert testimony, September 26, 2006 motion for leave to file motion for leave to designate French law expert, and March 2, 2007 supplemental motion to exclude expert testimony, because the court had determined that Texas law governed the contractual relationship between AMX and Pilote, and it had dismissed all of Pilote's French-law counterclaims. *AMX I,* 2007 WL 1695120, at *14 n.13. Within 14 days of the date this memorandum opinion and order is filed, a party may identify in writing a component of one or more of these motions that it maintains is not moot, state briefly the reason for its position, and request a ruling.

**SO ORDERED.**

August 7, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 38 -